UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

RODNEY RODRIGUEZ SHIPMAN,

     Plaintiff,

v.                                Case No.  5:15cv133/WTH/CJK

UNITED STATES OF AMERICA, et al.,

     Defendants.

_____/

ORDER and
REPORT AND RECOMMENDATION

    This prisoner action[1] is before the court upon defendant Dr. Perry Cattau's motion for summary judgment (doc. 104) with evidentiary materials (doc. 101). Plaintiff has responded in opposition (doc. 111) with evidentiary materials (doc. 107). Plaintiff has also filed a motion to strike Dr. Cattau's affidavit (doc. 113), a motion to compel Dr. Cattau to respond to two interrogatories and one document request (doc. 115), a motion for reconsideration (doc. 110) and a motion to compel

---

[1] Plaintiff takes issue with the undersigned's use of the term "prisoner" instead of "inmate". (*See* Docs. 84, 115). Plaintiff believes "prisoner" is a "mischaracterization" which "casts a negative light on the Plaintiff in this case". (Doc. 84, p. 2). Plaintiff also believes the term is hurtful and derogatory. (Doc. 84, pp. 2-3; Doc. 115, p. 5 n.1). This case, from the outset, has been governed by the Prison Litigation Reform Act which consistently uses the term "prisoner" throughout its statutory scheme. *See* 28 U.S.C. § 1915A; 28 U.S.C. § 1915; 42 U.S.C. § 1997e. Plaintiff meets the statutory definition of "prisoner". *See* 28 U.S.C. § 1915A(c); 28 U.S.C. § 1915(h); 42 U.S.C. § 1997e(h).

the clerk of court to mark all mail addressed to him "Special Mail – Open only in presence of inmate" (doc. 118).  Defendant Dr. Cattau has responded in opposition to plaintiff's motion to compel (doc. 116), and plaintiff has replied (doc. 120).  These matters are referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(C).  Upon careful consideration, the undersigned concludes that plaintiff's motions should be denied, and that defendant Dr. Cattau's motion for summary judgment should be granted.

BACKGROUND AND PROCEDURAL HISTORY[2]

Plaintiff is a prisoner of the Federal Bureau of Prisons (BOP) currently confined at the Federal Correctional Institution in Marianna, Florida (FCI-Marianna).  This lawsuit arises from the medical care plaintiff received after he was injured while playing football at FCI-Marianna on November 6, 2010.  Plaintiff commenced this action on June 8, 2015.

As a result of the court's preliminary screening of plaintiff's original complaint, plaintiff filed an amended complaint on August 19, 2015, asserting claims under the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680; and *Bivens v.*

---

[2] Due to the recent judicial officer reassignment (doc. 100), the undersigned relates the procedural history in some detail.

*Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971).  (Doc. 11).  Plaintiff's amended complaint named four defendants:  the United States of America, Perry Cattau, M.D., Hector Lopez, M.D., and Nikki Albu-Gardner, M.L.P.  (Doc. 11).  Plaintiff identified Dr. Cattau as an employee of Jackson Hospital (doc. 11, Section II ¶ 2, Section V ¶ 9), and identified his claim against Dr. Cattau as one of "Deliberate Indifference", asserting:

> [34]  Defendant Perry [sic] committed gross medical practice when he, during his treatment of Plaintiff in the emergency room, exposed Plaintiff to a substantial risk of serious harm by not ordering a MRI, and that he disregarded that risk by conduct that was more than negligence.

> [35]  Defendant Perry [sic] knew, or should have known, that Plaintiff's serious neck/back injury required a MRI to adequately diagnose Plaintiff's condition, whereas, x-rays failed to provide any reliable means for diagnosis.

(Doc. 11, Section V ¶¶ 34-35).  Plaintiff's "Statement of Claims" asserted that "Defendant, by and through its agents, servants, and/or employees failed to act as physician and health care providers, when they proceeded negligently in the diagnosis, treatment of Plaintiff's serious neck/back injury, resulting that Plaintiff suffered permanent injury to his neck/back, in in [sic] violation of the Eighth Amendment to the United States Constitution."  (Doc. 11, Section VI).

Defendant Dr. Cattau construed plaintiff's amended complaint as asserting a state-law medical malpractice or medical negligence claim against him, and sought

dismissal on the ground that plaintiff failed to comply with Florida's statutory pre-suit notice, investigation and other requirements, and the statute of limitations had run. (Doc. 25 (discussing Chapter 766, Florid Statutes)). Plaintiff responded that he was not asserting a medical malpractice or medical negligence claim under Florida state law; rather, he was asserting a negligence claim under the FTCA and a medical deliberate indifference claim under 42 U.S.C. § 1983; thus Florida's pre-suit requirements did not apply. (Doc. 69, p. 6 ("[T]he claim against Defendant is not a state law medical negligence claim but a § 1983 and FTCA claim in which Plaintiff alleges that Defendant acted not merely with negligence but with deliberate indifference to Plaintiff's constitutional rights. Thus, Defendant's motion should be denied."); *see also* Doc. 69, pp. 7-9). Dr. Cattau replied that even construed as a claim under 42 U.S.C. § 1983, plaintiff's amended complaint failed to state a facially plausible § 1983 claim against him. (Doc. 74).

On June 17, 2016, the undersigned issued a report recommending that Dr. Cattau's motion to dismiss be granted and that Cattau be dismissed from this suit for the following reasons: (1) plaintiff explicitly abandoned any state-law medical malpractice or medical negligence claim against Dr. Cattau that could be construed from his amended complaint; (2) plaintiff had no viable federal-law malpractice or negligence claim against Dr. Cattau under the FTCA because, as plaintiff was

advised early in this litigation (doc. 9), all actions brought pursuant to the FTCA must be brought against the United States of America, and the United States is the only proper defendant to an FTCA claim; (3) plaintiff's amended complaint failed to state a plausible Eighth Amendment deliberate indifference claim against Dr. Cattau under 42 U.S.C. § 1983.  (Doc. 75).  With regard to plaintiff's deliberate indifference claim, the undersigned concluded that plaintiff's allegations did not support a reasonable inference that Cattau was acting "under color of state law" in treating plaintiff's injury (i.e., that Dr. Cattau's alleged infringement of plaintiff's Eighth Amendment right to adequate medical care was "fairly attributable to the State."), and that plaintiff's allegations did not support a reasonable inference that Cattau acted with an attitude of deliberate indifference (i.e., that Cattau knew, during his treatment of plaintiff in the emergency room, that he was exposing plaintiff to a substantial risk of serious harm by ordering a CT scan and x-rays but not an MRI). The undersigned noted that Dr. Cattau's choice of diagnostic imaging was precisely the type of medical judgment the Supreme Court has determined does not support an Eighth Amendment deliberate indifference claim.  (Doc. 75, pp. 13-14 (*citing* Supreme Court and Eleventh Circuit cases)).

Plaintiff objected, arguing, as relevant here, that he "established a facially plausible FTCA claim against Dr. Cattau" (doc. 84, p. 6), because Dr. Cattau was a

"federal contractor" who was an "integral part" of plaintiff's FTCA claim against the United States, and was therefore "a defendant amenable to an FTCA suit under supplemental jurisdiction."  (Doc. 84, pp. 1-2, 4).  Plaintiff relied on *Hollman v. United States*, 783 F. Supp. 221 (M.D. Pa. 1992), to support this contention.  In *Hollman*, the plaintiff Ms. Hollman sued the United States and a private party (Goodwill Industries), alleging she was injured as a result of their negligence when she slipped and fell on melted snow in the lobby of the Federal Building in Harrisburg, Pennsylvania.  The United States allegedly contracted with Goodwill to provide janitorial services, which included keeping the lobby floors clean.  *Hollman* at 222.  Plaintiff Holloman asserted an FTCA claim against the United States and a state-law negligence claim against Goodwill.  Goodwill moved to dismiss the state-law negligence claim against it for lack of subject matter jurisdiction, arguing that the FTCA did not confer jurisdiction on private tortfeasors, and that pendent jurisdiction was not available.  *Id*.  Plaintiff Hollman argued that the federal court should exercise pendent jurisdiction over her state-law negligence claim, or, in the alternative, should transfer the case to the appropriate state forum.  *Id*. at 222.  The district court acknowledged that Goodwill could not be sued under the FTCA, but determined that it had supplemental jurisdiction under 28 U.S.C. § 1367(a), over Hollman's state-law negligence claim against Goodwill.  *Hollman* at 222-223; *see*

*also* 28 U.S.C. § 1367(a) (providing that a federal district court "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."). *Hollman* did not hold that Goodwill could be sued under the FTCA; it merely held that Plaintiff Hollman could maintain her state-law negligence suit against Goodwill in federal court, as part of her federal lawsuit against the United States.

In addition to the *Hollman* argument, the plaintiff here went on to argue in his objections to the June 17, 2016, Report and Recommendation that his medical negligence claim against Dr. Cattau was "brought under federal law", not state law, and that he "had no intention to abandon any federal claim, even if that claim must be evaluated on state law negligence standards." (Doc. 84, p. 4). Plaintiff did not identify any specific federal law (other than the FTCA) under which his proposed "federal" medical negligence claim against Dr. Cattau arose. (Doc. 84, pp. 2, 3).

Plaintiff's objections then conceded that he "does not have a viable Bivens claim against Dr. Cattau". (Doc. 84, p. 6). Plaintiff nonetheless asserted he had a viable § 1983 claim against Dr. Cattau for medical deliberate indifference. (Doc. 84, pp. 4-6). Plaintiff argued that Cattau was "acting under color of state law because state law allows him to contract with the Federal BOP", and because Cattau had a

"contractual relationship with the BOP". (Doc. 84, p. 4). Plaintiff reasserted his conclusion that Cattau was deliberately indifferent, stating, in support, that "an expert neurologist or neurosurgeon can establish in an affidavit or testimony that Dr. Cattau knew of the risk and disregarded it" when he failed to order an MRI or neurological evaluation. (Doc. 84, pp. 5-6).

The District Judge considering the undersigned's Report and Recommendation and plaintiff's objections, issued the following order on August 22, 2016:

> Having considered the Report and Recommendation, and the timely filed objections, I have determined that the Report and Recommendation should not be adopted at this time. Plaintiff's complaint, ECF No. 11, alleges that he was sent to the emergency room and was treated by Defendant Dr. Cattau, an employee of Jackson Hospital; however, he fails to allege Dr. Cattau was a contractor until his objections on ECF No. 84. Accordingly, the Court construes the objections as a motion to amend his complaint and will grant Plaintiff an opportunity to amend.
>
> As to Plaintiff's objections to the state law claim, Plaintiff attempts to distinguish between federal and state actions before arguing that he does not intend to "abandon any federal claim, even if that claim must be evaluated on state law negligence standards." ECF No. 84 at 4. In other words, Plaintiff argues that his federal complaint is based on state law. This is a separate issue from whether he separately states a state law claim. Accordingly, the Court agrees with the Magistrate Judge's analysis in the Report and Recommendation, ECF No. 75, and finds that Plaintiff has abandoned any state law claim against Dr. Cattau, but he may pursue a federal claim based on state law.

(Doc. 86, pp. 1-2).  The District Judge's order did not address plaintiff's waiver of any *Bivens* claim.  Nor did the order address plaintiff's failure to state a plausible claim of medical deliberate indifference regardless of Dr. Cattau's status as a state or federal actor.  The District Judge denied defendant Dr. Cattau's motion to dismiss, directed plaintiff to file an amended complaint within a time certain, and remanded the matter to the undersigned for further proceedings.  (Doc. 86, p. 2).

In the meantime, the undersigned, in a separate report, recommended that plaintiff's Eighth Amendment medical deliberate indifference claims asserted under *Bivens* against BOP employees Dr. Lopez and MLP Gardner be dismissed for failure to exhaust administrative remedies.  (Doc. 73).  The District Judge adopted that Report and Recommendation, and dismissed plaintiff's individual capacity Eighth Amendment medical deliberate indifference claims against Lopez and Gardner. (Doc. 90).  The District Judge remanded plaintiff's FTCA claim against the United States to the undersigned for further proceedings.  (Doc. 90).

On remand, the undersigned ordered plaintiff to file a third amended complaint removing the dismissed claims.  (Doc. 95).  Plaintiff filed his third amended complaint on October 20, 2016, which is the operative pleading.  Plaintiff's third amended complaint identifies this action as a civil rights action under 28 U.S.C. § 1331 or § 1346, and an action under the Federal Tort Claims Act, 28 U.S.C. §§

2671-2680.  (Doc. 95, p. 1).  Plaintiff's third amended complaint names two

defendants:  the United States of America and Dr. Perry Cattau.  Plaintiff is suing

Dr. Cattau under a theory labeled "Deliberate Indifference", asserting as follows:

> [34]  Defendant Perry committed gross medical practice when he, during his treatment of Plaintiff in the emergency room, exposed Plaintiff to a substantial risk of serious harm by not ordering a MRI, and that he disregarded that risk by conduct that was more than negligence.

> [35]  Defendant Perry knew, or should have known, that Plaintiff's serious neck/back injury required a MRI to adequately diagnose Plaintiff's condition, whereas, x-rays failed to provide any reliable means for diagnosis.

(Doc. 95, Section V ¶¶ 34-35).  Plaintiff's "Statement of Claims" asserts the

following (relevant to Dr. Cattau):

> Defendant United States, through their agents, employees, contractors, and servants negligently diagnosed and treated Plaintiff by not immediately referring his serious spinal injury to a neurologist and performing an MRI. . . .  Employees were deliberately indifferent to Plaintiff's medical needs.  Defendant's action and inactions caused Plaintiff serious pain and permanent injury, violating his Eighth Amendment right.

(Doc. 95, Section VI).  As relief, plaintiff seeks $50 million.  (Doc. 95, Section VII).

Defendant Dr. Cattau moves for summary judgment on the grounds that (1)

he was not acting under color of state law; (2) he did not act with deliberate

indifference; and (3) plaintiff did not exhaust his available administrative remedies

prior to initiating this lawsuit.  (Doc. 104).   Defendant Dr. Cattau's evidentiary

materials consist of Dr. Cattau's affidavit (doc. 101) and material previously submitted by the United States of America in support of its motion for summary judgment (doc. 58), including declarations, excerpts from plaintiff's medical records, and copies of plaintiff's administrative grievances.[3]  Plaintiff's evidentiary materials consist of an affidavit by a radiologist – Kenneth William Mask, MD, ABR, ACR, accompanied by excerpts from plaintiff's medical records, plaintiff's own affidavit and copies of plaintiff's administrative grievances.  (Doc. 107).

MATERIAL FACTS OF WHICH THERE IS NO GENUINE DISPUTE

The following facts are drawn from the evidence in the summary judgment record (docs. 58, 101, 107) that may be considered on summary judgment.[4]  The court relates only those facts relevant to plaintiff's claim against defendant Dr. Cattau.  Where the parties offer conflicting accounts of the events in question, the court "sets forth the facts, drawn from the evidence presented, in the light most

---

[3] These records were appended to the United States' first motion for summary judgment (doc. 58). Dr. Cattau is entitled to rely upon these medical records as materials on file.  *See* Fed. R. Civ. P. 56(c).

[4] "'An affidavit or declaration used to support or oppose a motion must be made on personal knowledge.'" *Howard v. Memnon*, 572 F. App'x 692, 694 (11th Cir. 2014) (*citing Murrell v. Bennett*, 615 F.2d 306, 310 n.5 (5th Cir. 1980), *and quoting* Fed. R. Civ. P. 56(c)(4)) (footnote omitted).  Conclusory statements are inadmissible because they are not based on personal knowledge.  *Lloyd v. Card*, 283 F. App'x 696, 701 (11th Cir. 2008) (*citing Marshall v. City of Cape Coral, Fla.*, 797 F.2d 1555, 1559 (11th Cir. 1986) ("inferences based upon speculation are not reasonable")).

favorable to the plaintiff." *See Snow ex rel. Snow v. City of Citronelle*, 420 F.3d 1262, 1265 (11th Cir. 2005).

On November 6, 2010, plaintiff was playing football at FCI-Marianna. (Doc. 107, Ex. D, Shipman Aff., p. 1). Another inmate ran into plaintiff while he was snapping the ball, thereby jamming plaintiff's neck and briefly knocking him unconscious. (Doc. 107, Ex. D, Shipman Aff., p. 1). When plaintiff came to, he could not feel anything except pressure on his chest. (Doc. 107, Ex. D, Shipman Aff., p. 1). Plaintiff's neck was stabilized with a collar, he was rolled as a unit onto a spine board, and he was taken to the medical department at FCI-Marianna for evaluation of a "suspected neck injury." (Doc. 107, Ex. D, Shipman Aff., pp. 1-2; Doc. 107, Ex. B, pp. 2-4). There, plaintiff complained to institutional medical personnel that he was unable to move normally and felt tingling "everywhere" with pins-and-needles type pain. (Doc. 107, Ex. B, p. 2). Plaintiff also reported pain in his arms and legs when he moved them. (Doc. 107, Ex. B, p. 2). BOP medical personnel determined that plaintiff required further evaluation and treatment by emergency medical personnel at an outside hospital. (Doc. 107, Ex. B, p. 3).

Plaintiff was transported to the emergency room at Jackson Hospital in Marianna, Florida, where he was treated by defendant Dr. Cattau. (Doc. 107, Ex. B, p. 5; Doc. 101, Cattau Aff. ¶ 4). Defendant Dr. Cattau is a medical doctor and has

been licensed to practice medicine in the State of Florida since 1982. (Doc. 101, Cattau Aff. ¶ 2). At the time Dr. Cattau treated plaintiff in 2010, Cattau was an employee of Jackson Hospital and was not employed, or under contract to provide medical services, with any entity other than Jackson Hospital. (Doc. 101, Cattau Aff. ¶¶ 3, 13). Defendant Dr. Cattau has never been employed by, or had a contract with, the Federal Bureau of Prisons or the United States of America. (Doc. 101, Cattau Aff. ¶ 13).

Defendant Dr. Cattau obtained a history from plaintiff and performed a physical examination. (Doc. 101, Cattau Aff. ¶ 5). In Dr. Cattau's neurologic system review, plaintiff exhibited numbness, weakness and paresthesias (tingling). (Doc. 107, Mask Aff. ¶ 4, Doc. 107, Ex. B, p. 11). Plaintiff also reported he had pain in his arm, leg, back and neck. (Doc. 101, Cattau Aff. ¶ 5; Doc. 107, Ex. B, pp. 11-12). In Dr. Cattau's musculo/skeletal review, plaintiff showed arthralgias (joint pain). (Doc. 107, Mask Aff. ¶ 4; Doc. 107, Ex. B, p. 11). In Dr. Cattau's cardiovascular (CV) review, there was no indication of edema. (Doc. 107, Mask Aff. ¶ 8; Doc. 107, Ex. B, p. 11). The CV portion of Dr. Cattau's physical examination revealed no edema or varicosities. (Doc. 107, Mask Aff. ¶ 8; Doc. 107, Ex. B, p. 12). Dr. Cattau's Lym review exposed a Cervical Adenopathy (enlargement of the lymph glands in the neck). (Doc. 107, Mask Aff. ¶ 4, Doc. 107,

Ex. B, p. 12).  Dr. Cattau ordered diagnostic tests including x-rays and CT scans, the result of which are discussed in more detail below.  (Doc. 101, Cattau Aff. ¶6; Doc. 107, Ex. B, p. 10).

Dr. Cattau initially ordered an x-ray of the cervical spine, which showed normal alignment of the vertebral bodies and no obvious compression fractures.  (Doc. 101, Cattau Aff. ¶ 7; Doc. 107, Ex. B, p. 6).  The seventh cervical vertebra, however, could not be visualized in the x-ray.  (Doc. 101, Cattau Aff. ¶ 7).  Based on plaintiff's clinical presentation and x-ray films, defendant Dr. Cattau decided to order a CT scan of the cervical spine and brain, and an x-ray of both shoulders.  (Doc. 101, Cattau Aff. ¶ 8; Doc. 107, Ex. B, pp. 5, 7, 8).  The x-ray of plaintiff's shoulders and CT of his brain revealed no abnormalities.  (Doc. 101, Cattau Aff. ¶ 9; Doc. 107, Ex. B, pp. 7, 8).  The radiologist interpreting the CT of plaintiff's cervical spine, Dr. Raul Olazabal, reported that the CT revealed no fractures or subluxations, and the facet joints were intact; however, there was significant posterior osteophyte formation at the third, fourth, and seventh cervical vertebra, as well as marked calcification of the posterior longitudinal ligament.  (Doc. 101, Cattau Aff. ¶ 9; Doc. 107, Mask Aff. ¶ 5; Doc. 107, Ex. B, p. 5).  Radiologist Dr. Olazabal assessed these findings as chronic, rather than acute.  (Doc. 101, Cattau Aff. ¶ 9; Doc. 107, Ex. B, p. 5; Doc. 107, Mask Aff. ¶ 5).

Based on the information defendant Dr. Cattau gleaned from plaintiff's stated history, his examination of plaintiff and his review of the results of the radiographic studies, Dr. Cattau diagnosed plaintiff as suffering a brachial plexus injury and a closed head injury. (Doc. 101, Cattau Aff. ¶ 10; Doc. 107, Ex. B, pp. 9, 10). Dr. Cattau determined that plaintiff was stable and did not have an acute condition requiring further emergency treatment, and that it was appropriate to return him to FCI-Marianna for further monitoring and follow-up treatment by medical staff at that facility. (Doc. 101, Cattau Aff. ¶ 10). Dr. Cattau's discharge orders included neurological checks to be performed every 3 hours for the next 24 hours; application of ice to sore areas every 2 to 3 hours for the next 24 to 48 hours; and no physical activity for the next 2 weeks until cleared by FCI-Marianna medical staff. (Doc. 101, Cattau Aff. ¶ 11; Doc. 107, Ex. B, p. 9). That ended defendant Dr. Cattau's involvement in plaintiff's care.

After plaintiff returned to FCI-Marianna, he received follow-up treatment, evaluation and monitoring by institutional medical staff. (Doc. 107, Ex. A, pp. 8-58 in ECF). On January 17, 2014, pursuant to FCI-Marianna medical staff's request for a neurology consult, (doc. 107, Ex. A, pp. 51-58), plaintiff was seen by Ricardo Ayala, M.D., a neurologist with the Tallahassee Neurological Clinic. (Doc. 107, Ex. A, pp. 59-62). Dr. Ayala identified plaintiff's problem #1 as cervical spondylosis

with myelopathy.  (Doc. 107, Ex. A, p. 62).  Dr. Ayala stated:  "To me he has a lot of findings that could suggest cervical myelopathy and it's certainly possible that he could have sustained a contusion to the cervical spine which would have been completely masked by the x-rays as well as CT scan of the cervical spine."  (Doc. 107, Ex. A, p. 62).  Dr. Ayala referred plaintiff for an MRI of his cervical spine. (Doc. 107, Ex. A, p. 62).

The MRI was performed on February 19, 2014.  (Doc. 107, Ex. A, p. 63).  The radiologist, Dr. David Durden issued a report that same date.  Dr. Durden reported that the indication for the MRI was:  "Neck pain and bilateral extremity pain and numbness for four years.  No recent injury."  (Doc. 107, Ex. A, p. 63).  Dr. Durden found:  "Severe cervical spondylostenosis at C3-C4 with cord flattening and perhaps very early spinal cord edema".  (Doc. 107, Ex. A, p. 63).  Dr. Durden recommended a neurosurgical consultation.  (Doc. 107, Ex. A, p. 63).

On February 20, 2014, plaintiff was seen by Dr. T. A. Oliver, a neurosurgeon with the Tallahassee Neurological Clinic.  (Doc. 107, Ex. A, p. 64).  In his February 24, 2014, report, Dr. Oliver found "multiple level cervical spondylosis from C3-C6 but without frank spinal cord compression except at C3-4.  At this level there is disc herniation centrally with edema in the spinal cord.  The spinal cord was effaced with

evidence of myelomalacia and no spinal fluid is present at that level." (Doc. 107, Ex. A, p. 67). Dr. Oliver related this impression and recommendation:

> Problem #1: Cervical spondylosis with myelopathy
>
> Rodney Shipman has been referred for evaluation of h[is] signs of myelopathy. His history is concerning for a central cord-like syndrome in 2010 with likely a chronic myelopathy since that time. On my exam, I can see evidence of hyperreflexia and in reviewing his MRI I am concerned about ongoing spinal cord injury. I discussed with him the risks[,] benefits and indications of an anterior cervical discectomy and fusion at C3-4. I have discussed with him the possibility of needing further operations following this however I think that given his exam and imaging that this is the most appropriate step in trying to arrest ongoing spinal cord injury.

(Doc. 107, Ex. A, p. 67). Dr. Oliver performed the anterior cervical discectomy and fusion at C3-4, on March 12, 2014. (Doc. 107, Ex. A, pp. 68-69). Plaintiff faults defendant Dr. Cattau for failing to order a neurological evaluation and MRI on the day of his injury, arguing that the delay caused him unnecessary pain and permanent injury.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 160 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ("[T]he plain language of Rule 56(a) mandates the entry of summary judgment, after adequate time for discovery

and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). In applying this standard, the court must view the facts in the light most favorable to the non-moving party (here, the plaintiff) and draw all reasonable inferences in favor of that party. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* An issue is "genuine" if the record taken as a whole could lead a rational fact finder to find for the non-moving party. *Id.* "[T]he nonmoving party cannot create a genuine issue of material fact through speculation, conjecture, or evidence that is 'merely colorable' or 'not significantly probative.'" *Vega v. Invsco Grp., Ltd.*, 432 F. App'x 867, 869-70 (11th Cir. 2011). Summary judgment is not appropriate "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995).

## APPLICATION OF THE LAW TO PLAINTIFF'S CLAIMS

Plaintiff faults defendant Dr. Cattau for failing to order an MRI instead of, or in addition to, the CT scans and x-rays.  (Doc. 95, Section V ¶¶ 34-35).  Labeling his claim as one of "deliberate indifference", plaintiff asserts that defendant Dr. Cattau committed "gross medical practice" by not ordering an MRI and that Cattau "knew, or should have known, that plaintiff's serious neck/back injury required a MRI to adequately diagnose Plaintiff's condition, whereas, x-rays failed to provide any reliable means for diagnosis."  (Doc. 95, Section V ¶¶ 34-35).  Plaintiff goes on to assert that defendant Dr. Cattau's actions support a claim for negligence against the United States, as Dr. Cattau was a "contractor" for the BOP.

<u>Negligence Claim</u>

Quoting from the District Judge's August 22, 2016, order which concluded that although plaintiff abandoned any state-law claim against Dr. Cattau, he "may pursue a federal claim based on state law", (doc. 86, p. 2), plaintiff suggests in his third amended complaint that Dr. Cattau is liable under federal law for medical negligence or malpractice.  (*See* Doc. 95).  The only source of federal tort law plaintiff identifies, however, is the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680.  (Doc. 95).

As the undersigned set forth in the June 16, 2016, Report and Recommendation, although the Federal Tort Claims Act creates a federal tort action whereby the United States is subject to liability in the same manner and to the same extent liability would be imposed against a private individual under the law of the State where the tort occurred, an FTCA claim can only be brought against the United States of America. 28 U.S.C. §§ 2671-2680; 28 U.S.C. § 1346(b). An FTCA claim cannot be brought against any other party, including individuals. 28 U.S.C. § 2679(a), (b)(1), (d)(1); *see also Simpson v. Holder*, 184 F. App'x 904, 908 (11th Cir. 2006) ("The United States is the only proper defendant in an FTCA action." (*citing* 28 U.S.C. § 2679; *Kennedy v. U.S. Postal Serv.*, 145 F.3d 1077, 1078 (9th Cir. 1998); *and Galvin v. OSHA*, 860 F.2d 181, 183 (5th Cir. 1988))). The undersigned emphasized this point at the beginning of this litigation two years ago (*see* doc. 9 (amend order)), and again one year ago in the report recommending dismissal of Dr. Cattau from this lawsuit (*see* doc. 75).

Plaintiff cannot rely on 28 U.S.C. § 1331 as a basis for a federal tort claim. Section 1331 is not a source of substantive rights, nor does it create a cause of action for the enforcement of substantive rights. Section 1331 merely recognizes federal courts' jurisdiction over federal questions. *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the

Constitution, laws, or treaties of the United States."). There is no Constitutional provision, act of Congress, or Supreme Court decision creating a private federal tort action for medical negligence against an individual. Similarly, Section 1367 is not a source of substantive rights and does not create a cause of action – it merely recognizes federal courts' jurisdiction over state-law claims (including state-law tort claims) when certain conditions exist. 28 U.S.C. § 1367(a). As plaintiff abandoned his state-law tort claim against defendant Dr. Cattau, and fails to identify any viable "federal claim involving state standard of medical malpractice and medical negligence against Dr. Cattau" (doc. 84, p. 6), Dr. Cattau is entitled to judgment in his favor on plaintiff's medical negligence/medical malpractice claim.

<u>Eighth Amendment Medical Deliberate Indifference Claim</u>

Plaintiff asserts an Eighth Amendment medical deliberate indifference claim against defendant Dr. Cattau. (Doc. 95, Section V ¶¶ 34-35). Plaintiff previously abandoned any *Bivens* claim against this defendant. (Doc. 84, p. 6 ("Plaintiff concedes that he does not have a viable Bivens claim against Dr. Cattau.")). Plaintiff apparently asserts his medical deliberate indifference claim under 42 U.S.C. § 1983.

A party who asserts a claim for relief under 42 U.S.C. § 1983 must allege and ultimately prove that (1) plaintiff was deprived of a right secured by the Constitution or laws of the United States, (2) the person who deprived him of that right acted

under color of state law, and (3) there was a causal connection between the constitutional violation and the defendant's acts or omissions. *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50, 119 S. Ct. 977, 143 L. Ed. 2d 130 (1999); *Troupe v. Sarasota Cnty., Fla.*, 419 F.3d 1160, 1165 (11th Cir. 2005); *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1059 (11th Cir. 2001). "The traditional definition of acting under color of state law requires that the defendant in a section 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988) (*quoting United States v. Classic*, 313 U.S. 299, 326, 61 S. Ct. 1031, 85 L. Ed. 1368 (1941)); *see also West* at 49 ("To constitute state action, the deprivation must be caused by the exercise of some right or privilege created by the State . . . or by a person for whom the State is responsible, and the party charged with the deprivation must be a person who may fairly be said to be a state actor." (internal quotation marks and citation omitted)).

Defendant Dr. Cattau argues that the summary judgment record reveals no genuine factual dispute, and that he is entitled to judgment as a matter of law because (1) the evidence establishes he was acting in his private capacity as an employee of Jackson Hospital and was not acting under the color of state law; (2) the evidence establishes that his decision of what diagnostic testing to order was an exercise of

medical judgment and was not the product of deliberate indifference; and (3) the evidence establishes that plaintiff failed to exhaust his administrative remedies concerning Dr. Cattau's care.  (Doc. 104).

Plaintiff opposes defendant Dr. Cattau's motion for summary judgment (doc. 111), and provides evidentiary materials supporting his response (doc. 107). Plaintiff's response is qualified, however, by his contention that he cannot present facts essential to oppose one aspect of Cattau's summary judgment motion:  namely, Cattau's contention that he was not acting under color of state or federal law.  (Docs. 108, 110).  Plaintiff explains that he did not receive a copy of the court's scheduling order issued November 16, 2016 (doc. 99), which set a discovery deadline of February 16, 2017.  Plaintiff states that although he engaged in discovery without having received a copy of the scheduling order, his failure to receive notice of the discovery deadline caused him to submit his second set of discovery requests too late and to miss the deadline for filing a motion to compel.  (Doc. 110).[5]  Plaintiff has nonetheless filed his motion to compel.  (Doc. 115).  Defendant Dr. Cattau responded on the merits, and plaintiff replied.  (Docs. 116, 120).

---

[5] Plaintiff presents these arguments in a motion for reconsideration.  (Doc. 110).  After the discovery period closed and the court set a submission date for defendants' motions for summary judgment, plaintiff moved to continue the submission date for the reason that he wanted to file a motion to compel and to conduct depositions.  (Doc. 108).  The court denied plaintiff's motion due to the discovery deadline having passed.  (Doc. 109).  Plaintiff seeks reconsideration of that order on the grounds that he was unaware of the discovery deadline. (Doc. 110).

Federal Rule of Civil Procedure 56 governing summary judgment motions provides:

> **(d)  When Facts are Unavailable to the Nonmovant.**  If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> > **(1)**  defer considering the motion or deny it;
> >
> > **(2)**  allow time to obtain affidavits or declarations or to take discovery; or
> >
> > **(3)**  issue any other appropriate order.

Fed. R. Civ. P. 56(d).  "The party seeking to compel discovery under Rule 56 cannot rely on 'vague assertions' that additional discovery will produce needed but unspecified facts; he must 'specifically demonstrate' how discovery will rebut the moving party's showing of the absence of a genuine issue of fact."  *May v. Hetzel*, 630 F. App'x 994, 997 (11th Cir. 2015) (*quoting Reflectone, Inc., v. Farrand Optical Co., Inc.*, 862 F.2d 841, 843 (11th Cir. 1989)).

Plaintiff asserts that additional discovery is needed to "follow-up on answer received from defendant Dr. Cattau regarding his contractual relationship with the BOP, which was the primary reason the third amended complaint was drafted. Plaintiff is probing the relationship between the BOP, Jackson Hospital and Dr. Cattau."  (Doc. 115, p. 3 ¶ 6).  Plaintiff goes on to assert that he would like to compel

defendant Dr. Cattau to answer an additional interrogatory "defining the relationship between Dr. Cattau and Jackson Hospital on November 6, 2010 . . . .  This evidence is relevant to establish Dr. Cattau's relationship to the BOP."  (Doc. 115, pp. 5-6 ¶ 2).  Plaintiff would also like to require Dr. Cattau to produce "all documents establishing Dr. Cattau's relationship to Jackson Hospital on November 6, 2010 . . . .  This evidence is relevant to the issue of Dr. Cattau's relationship to the BOP".  (Doc. 115, p. 6 ¶ 1; *see also* Doc. 111, pp. 10, 15).

Plaintiff has not shown that his proposed additional discovery will enable him to present facts essential to justify his opposition to defendant Dr. Cattau's motion for summary judgment.  Defendant Dr. Cattau has defined his relationship with Jackson Hospital by stating, under oath, that at the time he provided treatment to plaintiff, he "was employed by Jackson Hospital".  (Doc. 101, Cattau Aff. ¶ 3).  Dr. Cattau has also addressed whether he had any relationship with the BOP at the time he treated plaintiff.  Dr. Cattau states, under oath:  "At the time I treated Mr. Shipman, I was not employed or under contract to provide medical services with any entity other than Jackson Hospital, and I have never been employed by or had a contract with the Federal Bureau of Prisons or the United States of America."  (Doc. 101, Cattau Aff. ¶ 13).  Plaintiff has not shown that his proposed additional discovery will likely reveal any fact that could support a finding that Dr. Cattau had a

contractual relationship with the BOP or the United States.  Further, plaintiff's proposed additional discovery is focused solely on defendant Dr. Cattau's status, which is only one of the three bases on which defendant Dr. Cattau seeks summary judgment.  As the following discussion demonstrates, regardless of whether plaintiff can establish that Dr. Cattau was acting under color of state law, Dr. Cattau is still entitled to summary judgment because plaintiff's summary judgment materials do not create a triable issue of material fact as to whether the treatment plaintiff received from Dr. Cattau constituted a deliberate indifference to his serious medical need.  Plaintiff has not shown that his proposed additional discovery will allow him to present facts essential to justify his opposition to this independent basis for Dr. Cattau's motion for summary judgment,

A prisoner claiming he was deprived of adequate medical care in violation of the Eighth Amendment must show "(1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury."  *Danley v. Allen*, 540 F.3d 1298, 1310 (11th Cir. 2008).  Deliberate indifference has three components:  "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence."  *Farrow v. West*, 320 F.3d 1235, 1245 (11th Cir. 2003) (quotations omitted).  Deliberate indifference is not established "unless the official knows of and

disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). "Mere incidents of negligence or malpractice" in diagnosing or treating a medical condition "do not rise to the level of constitutional violations." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (*citing Estelle v. Gamble*, 429 U.S. 97, 104-106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)); *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000). Thus, a medical judgment call, or an accidental or inadvertent failure to provide adequate medical care, does not support a claim of cruel and unusual punishment. *Estelle*, 429 U.S. at 105-106. Of particular relevance here, the Court in *Estelle* explained:

> [T]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court under the [State's tort statute].

*Id.* at 107 (footnote omitted); *see also Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013) (noting that the deliberate indifference standard "is far more onerous" than the negligence standard); *Taylor* at 1258 (holding that the prisoner must prove that the official's response was so inadequate as to "constitute an unnecessary and wanton infliction of pain" and was not "merely accidental

inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law."),  Where the inmate has received medical attention, and the dispute is over the adequacy of that attention, courts are reluctant to question the accuracy or appropriateness of the medical judgments that were made.  *Harris*, 941 F.2d at 1507 (*citing Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989); *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976))).  To do otherwise would be "to constitutionalize claims that sound in tort law."  *Hamm v. DeKalb Cnty*., 774 F.2d 1567, 1575 (11th Cir. 1985).  Some of the ways in which prison officials might avoid Eighth Amendment liability is to show: (1) "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger;" (2) that "they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent;" or (3) that "they responded reasonably to the risk, even if the harm ultimately was not averted."  *Farmer*, 511 U.S. at 843-844.

This court must determine whether, viewing the record in the light most favorable to plaintiff, a genuine issue of material fact exists as to whether defendant Dr. Cattau's actions constituted deliberate indifference to plaintiff's serious medical need.  *See Estelle*, 429 U.S. at 104-105.  The facts regarding defendant Dr. Cattau's treatment are undisputed.  There is no direct or circumstantial factual evidence to

establish, or to allow a reasonable inference, that defendant Dr. Cattau knew his diagnostic testing and rendering of emergency care was grossly inadequate. The undisputed evidence shows that defendant Dr. Cattau interviewed plaintiff for the history of his injury and present symptoms, performed a thorough physical examination of plaintiff, ordered radiological diagnostic testing of plaintiff's spine, head and shoulders, ordered more in-depth radiological diagnostic testing of plaintiff's cervical spine, and discharged plaintiff only after determining that he was stable, that he had no acute condition requiring emergent care, and that he would receive further monitoring and evaluation by medical personnel at his institution. As explained in the undersigned's June 17, 2016, Report and Recommendation (doc. 75), Dr. Cattau's choice of diagnostic imaging is precisely the type of medical judgment the Supreme Court has determined does not support an Eighth Amendment deliberate indifference claim. *See Estelle*, 429 U.S. at 106-107; *see also Harris*, 941 F.2d at 1505; *Waldrop*, 871 F.2d at 1033; *see also, e.g., Boone v. Gaxiola*, 665 F. App'x 772, 774 (11th Cir. 2016) ("A medical decision not to pursue a particular course of diagnosis or treatment is a classic example of a matter for medical judgment, an exercise of which does not represent cruel and unusual punishment." (*citing Estelle*, 429 U.S. at 107-108)); *Criner v. Hernandez*, 562 F. App'x 930, 932 (11th Cir. 2014) ("[E]vidence of potential error in the medical judgment of [a

medical defendant] does not create a genuine issue of material fact because it does not demonstrate action or inaction beyond gross negligence."); *Clas v. Torres*, 549 F. App'x 922, 924 (11th Cir. 2013) (dismissing prisoner's medical deliberate indifference claim for failure to state a claim where prisoner admitted receiving medical attention for his migraine-like symptoms, which included medication, an x-ray and referral for a CT scan; "Although [the prisoner] felt these responses were inappropriate or inadequate, a doctor's choice of treatment and testing is a matter of medical judgment and does not state an Eighth Amendment deliberate indifference claim."). The facts and circumstances of this case do not create a factual issue of deliberate indifference or wanton conduct.

Plaintiff attempts to create a jury question on the issue of deliberate indifference by submitting the affidavit of a radiologist, Dr. William Kenneth Mask, M.D., A.B.R., A.C.R. (Doc. 107, Mask Aff. and Ex. C (Dr. Mask's curriculum vitae)). Dr. Mask reviewed plaintiff's medical records and affidavit (doc. 107, Attach.), and opines that the medical care defendant Dr. Cattau provided was grossly inadequate because Cattau failed to order an MRI or refer plaintiff to a neurologist. Dr. Mask states that the chronic symptoms identified in the November 6, 2010, CT scan of plaintiff's cervical spine made it "more likely that this patient would develop more consequences from trauma as opposed to someone with a normal spine" and

established "evidence of a potentially serious spinal cord injury." (Doc. 107, Mask Aff. ¶¶ 5-6). Considering the standard for a claim of deliberated indifference, however, there is no evidence in the record that defendant Dr. Cattau drew those inferences from the report of the CT scan of the cervical spine.

Dr. Mask also points out that two years later on June 6, 2012, medical staff at FCI-Marianna (MLP Gardner) noted, in requesting a referral for a neurological evaluation, that the CT scan of November 6, 2010, revealed posterior and anterior osteophytes at C3-C4. (Doc. 107, Mask Aff. ¶ 22 (*citing* Doc. 107, Ex. A, p. 34)). The entirety of MLP Gardner's notation reads:

> **Reason for Request**:
>
>> Refer[r]al for neurological evaluation for this [ ] year old male with chronic bilateral shoulder pain with radiation into bilateral arms, radicular pain into "entire body". Football injury 11/6/10 on rec yard with subsequent temporary paralysis lasting 3-4 hours.
>> X-Ray: Mild DDD, straightening of normal cervical lordosis, shoulder artifact obscures C7-T1. CT of neck/time of accident: Posterior osteophytes C3-C4, anterior osteophytes C3-4, C7.

(Doc. 107, Ex. A, p. 34). Unlike MLP Gardner, however, Dr. Cattau was not faced with a two-year history of chronic complaints of pain.

Dr. Mask also points to the later January 17, 2014, report of neurologist Dr. Ayala, in which Ayala states: "To me he has a lot of findings that could suggest cervical myelopathy and it's certainly possible that he could have sustained a

contusion to the cervical spine which would have been completely masked by the x-rays as well as CT scan of the cervical spine." (Doc. 107, Ex. A, p. 62).  Dr. Mask opines that this statement "establishes that an MRI taken in 2010 . . . was the test necessary to discover the predisposing factors that caused this patient to develop myelopathy".  (Doc. 107, Mask Aff. ¶ 7).  Even accepting as true that it was possible plaintiff could have sustained a contusion to the cervical spine when he was injured in 2010, and that such injury would not have been detected by the radiological testing Dr. Cattau ordered but would have been detected by an MRI, that evidence does not reasonably support a jury finding that (1) Dr. Cattau knew there was a substantial risk plaintiff suffered a contusion to the spine that was not detected by the diagnostic testing he ordered, and (2) Dr. Cattau disregarded that risk by conduct that was more than negligence.  Again, Dr. Ayala had a four-year medical history Dr. Cattau did not have.

In a related vein, Dr. Mask discusses the February 19, 2014, MRI report of radiologist Dr. Durden.  (Doc. 107, Ex. A, p. 63).  Dr. Durden states that the medical indication for the MRI was plaintiff's history of "neck pain and bilateral extremity pain and numbness for four years." (Doc. 107, Ex. A, p. 63).  Dr. Durden's report finds that "[t]here may be very minimal early cord edema at C3-C4", and establishes Durden's impression of "severe cervical spondylostenosis at C3-C4 with cord

flattening and perhaps very early cord edema." (*Id.*). Dr. Mast concludes from Dr. Durden's report that: "[A]n MRI would have discovered edema present, particularly in light of the trauma, and therefore would have documented neuro compromise much earlier. An MRI taken in November of 2010 would have revealed enough information to prevent the serious pain and injury the patient endured for 4 years." (Doc. 107, Mast Aff. ¶ 8). Again, even accepting as true that there was perhaps very minimal cord edema at the time Dr. Cattau treated plaintiff and that such injury would not have been detected by the radiological tests Dr. Cattau ordered but would have been detected by an MRI, that evidence does not reasonably support a jury finding that Dr. Cattau knew there was a substantial risk of as-yet-undetected cord edema and that he disregarded that risk by conduct that was more than negligence.

Dr. Mask also points to Dr. Oliver's impression and recommendations in his February 24, 2014, report that, "[plaintiff's] history is concerning for a central cord-like syndrome in 2010 with likely a chronic myelopathy since that time". (Doc. 107, Ex. A, p. 67). Dr. Mask states that Dr. Oliver's report establishes that "[c]learly the tests Dr. Cattau performed did not discover the predisposing factors causing myelopathy, and the neurological referral and MRI would have been the correct procedure." (Doc. 107, Mask Aff. ¶ 10). This backward-looking view could not support a jury finding that on November 6, 2010, Dr. Cattau knew – from plaintiff's

description of the football injury and symptoms, from Cattau's physical examination of plaintiff, from the initial radiology reports and from the follow-up radiology reports – that there was a substantial risk of an as-yet undetected spinal cord injury or edema requiring an immediate MRI or consultation with a neurologist, or knew that his treatment was otherwise grossly inadequate but proceeded with the treatment anyway.  In fact, the record shows that defendant Dr. Cattau believed plaintiff had a brachial plexus injury and closed head injury; that Dr. Cattau believed plaintiff was stable, had no acute condition and did not require additional emergency treatment; and that Dr. Cattau referred plaintiff for (what he thought was) appropriate observation, follow-up evaluation and treatment by medical personnel at plaintiff's institution.

Dr. Mask's concluding opinion on Dr. Cattau's treatment states:

> Any other reasonably trained physician, under the same or similar circumstances, and knowing what Dr. Cattau knew at the time would have referred the patient to a neurologist and would have at least taken an MRI.  A reasonably trained physician would have handled this patent's case differently and would have believed that doing so was responsible and done in good faith.  By failing to immediately refer this patient to a neurologist and failing to order an MRI, Dr. Cattau deviated from the standard of care in treating serious spinal cord injuries, causing significant pain and injury to this patient over nearly a four year period.

(Doc. 107, Mask Aff. ¶ 11).  Perhaps defendant Dr. Cattau should have perceived the 2010 radiology reports as reflecting the possibility of spinal cord edema or a

spinal cord injury and the need for an immediate neurological evaluation and MRI, but Eighth Amendment law does not hold Dr. Cattau responsible for that.

"[S]ince a finding of deliberate indifference requires a finding of the defendant's subjective awareness of the relevant risk, a genuine issue of material fact exists only if the record contains evidence, albeit circumstantial, of such subjective awareness." *Steele v. Shah*, 87 F.3d 1266, 1269 (11th Cir. 1996) (*citing Farmer*, 511 U.S. at 837, 842; *and Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (acknowledging *Farmer*'s requirement of subjective awareness and rejection of a solely objective test of deliberate indifference)).  Expert evidence of the standard of care and what a reasonable person would have known is objective in nature.  *Campbell v. Sikes*, 169 F.3d 1353, 1365, 1368-72 (11th Cir. 1999) (discussing the role of expert testimony in a post-*Farmer* decision turning on the subjective mental intent of medical professionals sued for deliberate indifference to an inmate's serious medical needs).  Conflicts in such objective evidence, without evidence of the particular defendant's subjective knowledge, does not create a triable issue of fact on the question of deliberate indifference.  *Campbell* at 1364-67 (concluding that although plaintiff's expert stated that the defendants' medical care was grossly inadequate and defendants' experts opined that the defendants complied with the applicable standard of care, that dispute did not create a triable issue on the

question of the defendants' subjective intent).  This excerpt from *Campbell* is of

particular relevance:

> The issue of subjective mental intent under *Farmer* is different
> from whether [the defendant's] medical treatment was negligent or
> grossly inadequate.  To decide the issue of subjective mental intent
> under *Farmer*, a jury would inquire (1) whether [the defendant] was
> aware of facts about Plaintiff from which he could draw the inference
> that his present course of treatment presented a substantial risk of
> serious harm to Plaintiff and (2) whether he actually drew that inference
> but persisted in the course of treatment anyway.  There is no direct or
> circumstantial evidence in this record from which the jury could infer
> [the defendant's] actual knowledge, and Plaintiff's experts' testimony
> does not provide the missing link under *Farmer* – at least under the
> facts and circumstances of this case.  Indeed, allowing expert testimony
> that [the defendant] should or would have known to raise a jury issue
> as to whether he actually knew effectively would nullify *Farmer*'s
> requirement of subjective mental intent.  The deficiency of the expert
> testimony here arises not necessarily from the specific wording of the
> experts' testimony – although some of Plaintiff's affidavits are lacking
> in many respects – but from the inherent opinion nature of expert
> testimony about what a person should or would have known.  The
> particular conflicting expert testimony here demonstrates only that
> there is a difference of opinion among professionals about what is
> accepted practice within the [particular medical] community and what
> a doctor should or would know.  Plaintiff's experts' testimony here at
> best allows an inference by the jury that a doctor should have perceived
> the risk of serious harm but not an inference that the doctor actually did
> perceive the risk and persisted in his course of treatment anyway.

*Id*. at 1370-1371 (footnotes omitted).

The opinion testimony by plaintiff's expert does not create a jury issue

regarding defendant Dr. Cattau's subjective mental intent required by *Farmer*,

because even considering Dr. Mask's opinion testimony, the summary judgment

record does not allow an inference that defendant Dr. Cattau not only should have perceived a substantial risk of serious harm but also actually did perceive it and disregarded it. *Campbell*, 169 F.3d at 1366-72; *see also Estelle*, 429 U.S. at 107. Viewing the summary judgment record in the light most favorable to plaintiff, a jury could not reasonably conclude that, based on the information known to defendant Dr. Cattau at the pertinent time, he deliberately ignored a substantial risk of serious harm that was obvious or known to him.

## CONCLUSION

The summary judgment record reveals no genuine dispute of material fact. Based on the undisputed material facts, a reasonable jury could not find that defendant Dr. Cattau acted with an attitude of deliberate indifference to plaintiff's serious medical needs (*i.e.*, that Dr. Cattau knew his diagnostic testing and treatment was grossly inadequate, but proceeded with the inadequate testing and treatment anyway). Plaintiff's evidence of negligence, including Dr. Mask's opinion, is insufficient to enable a jury to conclude that Dr. Cattau acted with the requisite subjective intent required by *Farmer*. Defendant Dr. Cattau is entitled to summary judgment.

Accordingly, it is ORDERED:

1.  Plaintiff's motion to strike defendant Dr. Cattau's affidavit (doc. 113) is DENIED.

2.  Plaintiff's motion to compel (doc. 115) is DENIED to the extent it seeks discovery from defendant Dr. Cattau.

3.  Plaintiff's motion for reconsideration (doc. 110) is DENIED to the extent it seeks reconsideration of the court's order (doc. 109) denying plaintiff's request to extend the submission deadline for defendant Dr. Cattau's motion for summary judgment.

4.  Plaintiff's "Motion for an Order Compelling the Clerk of Court to Comply with Special Mailing Procedures in 28 C.F.R. § 540.12(b), 540.18 and 540.19" (doc. 118) is DENIED.

And it is respectfully RECOMMENDED:

1.  That defendant Dr. Perry Cattau's motion for summary judgment (doc. 104) on plaintiff's § 1983 medical deliberate indifference claim be GRANTED.

2.  That all other claims against defendant Dr. Cattau (either directly asserted in plaintiff's third amended complaint or liberally construed therefrom) be DISMISSED WITH PREJUDICE as plaintiff explicitly abandoned any state-law medical malpractice or medical negligence claim against Dr. Cattau; plaintiff has no

cognizable "federal" tort action against Dr. Cattau; and plaintiff explicitly abandoned any *Bivens* claim against Dr. Cattau.

At Pensacola, Florida this 14th day of June, 2017.


*/s/ Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**


<u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations may be filed within 14 days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon the magistrate judge and all other parties. A party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.