UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

RODNEY RODRIGUEZ SHIPMAN,

     Plaintiff,

v.                                  Case No.  5:15cv133/WTH/CJK

UNITED STATES OF AMERICA, et al.,

     Defendants.

_____/

ORDER and
REPORT AND RECOMMENDATION

Plaintiff Rodney Shipman has filed a medical negligence claim against the United States of America ("the Government") under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680.   The Government moves for summary judgment.  (Doc. 102 (motion); Doc. 58 (evidentiary materials)).  Plaintiff opposes the motion.  (Doc. 112 (response); Doc. 107 (evidentiary materials)).  Also pending is plaintiff's motion to strike Dr. Lopez's affidavit (doc. 114); plaintiff's motion for reconsideration (doc. 110) of an order (doc. 109) denying an extension of the summary judgment deadline for purposes of compelling additional discovery; and plaintiff's motion to compel (doc. 115) which outlines the additional discovery plaintiff seeks in order to respond to the Government's summary judgment motion.

The Government opposes plaintiff's motion to compel. (Doc. 117). These matters are referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(C). Upon careful consideration, the undersigned concludes that the Government's motion for summary judgment should be granted in part and denied in part, and that plaintiff's motions should be denied.

## BACKGROUND AND PROCEDURAL HISTORY

Plaintiff is a prisoner of the Federal Bureau of Prisons ("BOP") currently confined at the Federal Correctional Institution in Marianna, Florida ("FCI-Marianna"). This lawsuit concerns the medical care plaintiff received after he injured his spine while playing football at FCI-Marianna on November 6, 2010. A detailed procedural history of this case is provided in the Report and Recommendation dated June 14, 2017. (Doc. 121). The following procedural history is limited to plaintiff's FTCA claim against the Government.

Plaintiff commenced this action on June 8, 2015. (Doc. 1). Plaintiff's third amended complaint, filed on October 20, 2016, is the operative pleading. (Doc. 95). Plaintiff seeks to hold the Government liable for the allegedly negligent medical care provided by Dr. Perry Cattau, Dr. Ernesto Toledo, Dr. Hector Lopez and Mid-Level Practitioner (MLP) Nikki Albu-Gardner. Plaintiff claims Cattau, Toledo, Lopez and

Gardner negligently failed to promptly order an MRI and neurology consultation at or near the time of his injury, and that Dr. Lopez negligently discontinued a neurology consultation in 2012, which further delayed the diagnosis and treatment of his injury. (Doc. 95, Section VI). As relief, plaintiff seeks $20 million in "actual damages", $20 million in compensatory damages, and $10 million in punitive damages. (Doc. 95, Section VII).

The Government moves for summary judgment on three bases: (1) Dr. Cattau was not an employee of the Government; therefore, the Government is not liable for his actions; (2) plaintiff cannot establish the essential elements of standard of care, breach, and causation, because he provides no supporting expert testimony; and (3) plaintiff cannot establish any injury arising from the BOP healthcare providers' alleged negligence. (Doc. 102). The Government's evidentiary materials consist of Dr. Cattau's affidavit (doc. 101), and materials previously submitted by the Government in support of its first motion for summary judgment (doc. 58). These materials include, as relevant here, Dr. Lopez's declaration, excerpts from plaintiff's medical records and copies of plaintiff's administrative grievances. (Doc. 58).

Plaintiff opposes the Government's motion (doc. 112), and provides evidentiary materials supporting his response (doc. 107). Plaintiff's evidentiary materials consist of his own affidavit (doc. 112, Ex. B), the affidavit of William

Kenneth Mask, MD, ABR, ACR, accompanied by excerpts from plaintiff's medical records, an additional affidavit of plaintiff, and copies of plaintiff's administrative grievances (doc. 107). Plaintiff's response is qualified, however, by his contention that he finds himself unable to present facts essential to oppose various aspects of the Government's motion for summary judgment. (Docs. 108, 110). Plaintiff explains that he did not receive a copy of the court's scheduling order issued November 16, 2016 (doc. 99), which set a discovery deadline of February 16, 2017. (Doc. 110). Plaintiff states that although he engaged in discovery without having received a copy of the scheduling order, his failure to receive notice of the discovery deadline caused him to submit his second set of discovery requests too late and to miss the deadline for filing a motion to compel responses to those requests. (Doc. 110).[1]

Plaintiff outlines the specific discovery he needs in a motion to compel. (Doc. 115). Plaintiff's proposed additional discovery involves essentially three categories of information: (1) discovery relating to Dr. Lopez's and Ms. Gardner's credibility

---

[1] Plaintiff presents these arguments in a motion for reconsideration. (Doc. 110). After the discovery period closed and the court set a submission date for the Government's motion for summary judgment, plaintiff moved to continue the submission date on the grounds that he wanted to take depositions and file a motion to compel responses to his second set of discovery requests. (Doc. 108). The court denied plaintiff's motion due to the discovery deadline having passed. (Doc. 109). Plaintiff seeks reconsideration of that order on the grounds that he was unaware of the discovery deadline. (Doc. 110).

(doc. 115 at 1-2 ¶¶ 1, 2); (2) discovery relating to the Government's liability for Dr.

Cattau's alleged negligence (doc. 115 at 3 ¶ 6 and ¶ 1; doc. 115 at 4 ¶ 4); and (3)

discovery relating to Dr. Lopez's and Ms. Gardner's credentials and experience (doc.

115 at 2 ¶¶ 3-5, p. 3 ¶ 2, and p. 4 ¶ 3). The Government opposes the motion. (Doc.

117).

Federal Rule of Civil Procedure 56 governing summary judgment motions

provides:

> **(d)  When Facts are Unavailable to the Nonmovant.**  If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
>> **(1)**  defer considering the motion or deny it;
>>
>> **(2)**  allow time to obtain affidavits or declarations or to take discovery; or
>>
>> **(3)**  issue any other appropriate order.

Fed. R. Civ. P. 56(d).  "The party seeking to compel discovery under Rule 56 cannot

rely on 'vague assertions' that additional discovery will produce needed but

unspecified facts; he must 'specifically demonstrate' how discovery will rebut the

moving party's showing of the absence of a genuine issue of fact."  *May v. Hetzel*,

630 F. App'x 994, 997 (11th Cir. 2015) (*quoting Reflectone, Inc., v. Farrand Optical

Co., Inc.*, 862 F.2d 841, 843 (11th Cir. 1989)).  Because plaintiff's motion to compel

was filed in the context of responding to the Government's summary judgment motion, the court will incorporate its discovery rulings on that subject into the relevant portion of the summary judgment analysis.

EVIDENTIARY RULINGS ON SUMMARY JUDGMENT MATERIALS

Only one objection has been made to the summary judgment materials. Plaintiff moves to strike Dr. Lopez's declaration because (1) Dr. Lopez is not qualified to render an expert opinion, and (2) Dr. Lopez lacks credibility because he was named as an individual *Bivens* defendant in this case, and plaintiff believes Dr. Lopez has misrepresented facts and falsified his medical records. (Doc. 114). Plaintiff's motion to strike will be denied, as the Government has not offered Dr. Lopez's declaration as opinion testimony. In addition, the court does not make credibility determinations at the summary judgment stage. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (holding that credibility determinations are functions of the fact-finder at trial, not a judge on summary judgment).

The Government has not objected to, moved to strike, or argued for exclusion of any of plaintiff's evidentiary materials, including Dr. Mask's affidavit. The Government does not challenge the designation of Dr. Mask, a board certified radiologist (doc. 107-1, p.93), as an expert nor his competence to provide expert

testimony on the matters stated in his affidavit. In the absence of an objection, the court will consider Dr. Mask's affidavit as expert testimony for purposes of summary judgment, and will not address whether Mask's testimony meets the relevant evidentiary rules for a physician's expert testimony in a medical negligence case. *See Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) ("If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived. . . ." (citations omitted)); *Munoz v. Int'l Alliance of Theatrical Stage Emps. and Moving Picture Mach. Operators of U.S. and Canada*, 563 F.2d 205, 214 (5th Cir. 1977) (holding that inadmissible material may be considered by a court on summary judgment if there has been no challenge (citing cases)); *Klingman v. Nat' Indem. Co.*, 317 F.2d 850, 854 (7th Cir. 1963) (holding that if no objection is made to a supporting or opposing affidavit, then the affidavit may be considered by the court in ruling on a motion for summary judgment); *Tucker v. Rose*, 955 F. Supp. 810, 814 (N.D. Ohio 1997) (holding that evidence not meeting the relevant admissibility standard may be considered unless the opposing party affirmatively raises the issue of the defect; the burden is on the opposing party to object and failure to do so constitutes waiver); *Burnett v. Stagner Hotel Courts, Inc.*, 821 F. Supp. 678, 683 n.2

(N.D. Ga. 1993), *aff'd*, 42 F.3d 645 (11th Cir. 1994) (noting that uncertified or otherwise inadmissible documents may be considered by a court in ruling on a motion for summary judgment if the documents are not challenged (*citing* 10A Charles Alan Wright et al., *Federal Practice And Procedure* § 2722)).

## MATERIAL FACTS

The following facts are drawn from the evidence in the summary judgment record, including plaintiff's verified third amended complaint (doc. 95), the Government's affidavits and other documents submitted in support of its first motion for summary judgment (doc. 58), the affidavit of Dr. Perry Cattau (doc. 101), and plaintiff's affidavits and other documents submitted in response to the motion for summary judgment (doc. 107, doc. 112, Ex. B). Where the parties offer conflicting accounts of the events in question, the court "sets forth the facts, drawn from the evidence presented, in the light most favorable to the plaintiff." *See Snow ex rel. Snow v. City of Citronelle*, 420 F.3d 1262, 1265 (11th Cir. 2005).

Plaintiff arrived at FCI-Marianna on May 2, 2007, with a history of recurrent foot and back pain, hypertension, and a prior diagnosis by military physicians of two herniated discs and degenerative disc disease. (Doc. 58, Ex. 4, Lopez Decl. ¶ 4 and Ex. 3 at 2-4; Doc. 107, Ex. A at 2-4). On November 6, 2010, plaintiff was injured while playing football at FCI-Marianna when another inmate ran into him as he

snapped the ball, thereby jamming plaintiff's neck. (Doc. 107, Ex. B; Doc. 107, Ex. D, Shipman Decl. at 1; Doc. 58, Ex. 5). Plaintiff momentarily lost consciousness and, when he came to, could not feel anything except pressure on his chest. (*Id*.). Plaintiff's neck was stabilized with a collar; he was rolled onto a spine board; and he was taken to the medical department at FCI-Marianna for evaluation of a "suspected neck injury." (Doc. 107, Ex. D, Shipman Decl. at 1-2; Doc. 107, Ex. B at 2-4). At the medical department, plaintiff told BOP medical staff (RN Jeanne Cloud) that he was "unable to move normally"[2], felt tingling "everywhere", and had pain to his arms and legs with movement. (Doc. 58, Ex. 3 at 9; Doc. 107, Mask Aff. ¶ 3 and Ex. A at 9). Plaintiff described his pain level as 9 out of 10 on the pain scale and as pins-and-needles-type quality. (Doc. 107, Ex. A at 9). BOP medical personnel determined that plaintiff required further evaluation and treatment by emergency medical personnel at an outside hospital. (Doc. 58, Lopez Decl. ¶ 5 and Ex. 3 at 9; Doc. 107, Mask Aff. ¶ 3 and Ex. A at 9).

Plaintiff was transported to the emergency room at Jackson Hospital in Marianna, Florida, where he was treated by Dr. Cattau. (Doc. 107, Ex. B at 5; Doc. 101, Cattau Aff. ¶ 4). Dr. Cattau is a medical doctor licensed to practice medicine

---

[2] This condition is described throughout the medical records as "temporary paralysis lasting 3-4 hours." *See* Doc. 107, Ex. A at 34, 38, 51, 52.

in the State of Florida since 1982. (Doc. 101, Cattau Aff. ¶ 2). At the time Dr.

Cattau treated plaintiff, Cattau was an employee of Jackson Hospital and was not

employed by, or under contract to provide medical services with, any entity other

than Jackson Hospital. (*Id*. ¶¶ 3, 13). Dr. Cattau has never been employed by, nor

ever had a contract with, the BOP or the Government. (*Id*. ¶ 13). Plaintiff asserts

that Dr. Cattau was an independent contractor with the BOP by virtue of a contract

between Jackson Hospital and the BOP. (Doc. 95 at 5 ¶ 9 (Third Amended Compl.)

(describing Dr. Cattau as having "a contractual relationship with the FBOP"); Doc.

111 at 1 ¶ 3 (Pl.'s Opposition to Def. Perry Cattau, M.D.'s Mot. for Summary

Judgment) ("FCI Marianna has a contractual relationship with Jackson Hospital,

who employs Dr. Cattau, therefore Dr. Cattau is an independent contractor to the

BOP."); *see also* Doc. 112 at 19 ¶ 2 (Pl.'s Opposition to Def. United States' Mot.

for Summary Judgment ("Dr. Cattau's status in this matter is addressed in Plaintiff's

motion in opposition to defendant Perry Cattau, M.D.'s motion for summary

judgment.")); Doc. 11 at 7-15 (stating plaintiff's conclusion, after identifying the

"control test"[3], that "Dr. Cattau is an independent contractor, not a BOP employee"

for FTCA purposes).

---

[3]*See Means v. United States*, 176 F.3d 1376, 1379 (11th Cir. 1999) ("[A] person is not an
'employee of the government' for FTCA purposes unless the government controls and supervises
the day-to-day activities of the individual." (*citing Logue v. United States*, 412 U.S. 521, 526-27,
93 S. Ct. 2215, 37 L. Ed. 2d 121 (1973)).

Dr. Cattau obtained a history from plaintiff and performed a physical examination. (Doc. 107, Mask Aff. ¶ 4; Doc. 101, Cattau Aff. ¶ 5). Plaintiff exhibited numbness, weakness and paresthesias (tingling) during Cattau's neurologic system review. (Doc. 107, Mask Aff. ¶ 4 and Ex. B at 11). Plaintiff also reported pain in his arm, leg, back and neck. (Doc. 101, Cattau Aff. ¶ 5; Doc. 107, Ex. B at 11-12). Plaintiff exhibited arthralgias (joint pain) during Dr. Cattau's musculo/skeletal review. (Doc. 107, Mask Aff. ¶ 4 and Ex. B at 11). Dr. Cattau's cardiovascular (CV) review revealed no indication of edema. (Doc. 107, Mask Aff. ¶ 8 and Ex. B at 11, 12). Dr. Cattau's Lym review exposed a Cervical Adenopathy (enlargement of the lymph glands in the neck). (Doc. 107, Mask Aff. ¶ 4 and Ex. B at 12). Dr. Cattau ordered an x-ray of plaintiff's cervical spine. (Doc. 101, Cattau Aff. ¶ 6; Doc. 107, Ex. B at 10).

Plaintiff's cervical spine x-ray showed normal alignment of the vertebral bodies and no obvious compression fractures. (Doc. 101, Cattau Aff. ¶ 7; Doc. 107, Ex. B at 6). The seventh cervical vertebra could not be visualized in the x-ray. (Doc. 101, Cattau Aff. ¶ 7). Based on plaintiff's clinical presentation and x-ray films, Dr. Cattau ordered a CT scan of the cervical spine and brain, and an x-ray of both shoulders. (Doc. 101, Cattau Aff. ¶ 8; Doc. 107, Ex. B at 5, 7, 8). The CT scan and x-ray revealed no abnormalities. (Doc. 101, Cattau Aff. ¶ 9; Doc. 107, Ex. B at 7,

8).   Dr. Raul Olazabal, the radiologist interpreting the CT of plaintiff's cervical spine, reported that the scan revealed no fractures or subluxations, and the facet joints were intact; however, the study showed "significant osteophyte formation" at the third, fourth, and seventh cervical vertebra, as well as "marked calcification of the posterior longitudinal ligament."  (Doc. 101, Cattau Aff. ¶ 9; Doc. 107, Mask Aff. ¶ 5 and Ex. B at 5).  Dr. Olazabal assessed these findings as chronic, rather than acute.  (Doc. 101, Cattau Aff. ¶ 9; Doc. 107, Mask Aff. ¶ 5 and Ex. B at 5).

Dr. Cattau diagnosed plaintiff as suffering a brachial plexus injury and a closed head injury.  (Doc. 101, Cattau Aff. ¶ 10; Doc. 107, Ex. B at 9, 10).  Dr. Cattau determined plaintiff was stable and did not have an acute condition requiring further emergency treatment, and that he should be returned to FCI-Marianna for further monitoring and follow-up by BOP medical staff.  (Doc. 101, Cattau Aff. ¶ 10).  Dr. Cattau's discharge orders included neurological checks every 3 hours for the next 24 hours; application of ice to sore areas every 2 to 3 hours for the next 24 to 48 hours; and no physical activity for the next 2 weeks until cleared by FCI-Marianna medical staff.  (Doc. 101, Cattau Aff. ¶ 11; Doc. 107, Mask Aff. ¶ 12 and Ex. B at 9).

After plaintiff returned to FCI-Marianna, he was seen by BOP healthcare provider RN Richetta Worlds, who documented her findings and the Jackson

Hospital discharge diagnosis and instructions. (Doc. 107, Mask Aff. ¶ 12 and Ex. A at 8-9; Doc. 58, Ex. 4, Lopez Decl. ¶ 6 and Ex. 5 at 14). Nurse Worlds described plaintiff's condition as "closed head injury, brachial nerve injury." (Doc. 107, Ex. A at 8). Plaintiff complained of acute pain to his upper torso and shoulders, which he rated as a 10. (*Id.*). Plaintiff also stated he felt weak and had vomited twice before leaving the hospital. (*Id.*). Plaintiff was given naproxen and methylprednisolone (a corticosteroid) and promethazine (an anti-allergy medication) injections. (*Id.*). Plaintiff was confined to living quarters except for meals, pill line and medical treatment, was given a lower bunk pass and was restricted from recreation and sports. (*Id.*). Plaintiff's unit officer and cell mate were instructed to wake him every three hours for the ensuing twenty-four hours. (*Id.*). Plaintiff was made aware of these instructions and verbalized his understanding. (*Id.*). Nurse Worlds scheduled a follow-up visit with an MLP for November 9, 2010.[4] (Doc. 107, Ex. A at 8; Doc. 58, Ex. 3 at 8 and Ex. 5 at 14).

On November 7, 2010, Nurse Worlds visited plaintiff in his housing unit. (Doc. 107, Ex. A at 11; Doc. 58, Ex. 3 at 11). Plaintiff stated he was able to move about but was still very sore especially in his upper torso area. (*Id.*). Plaintiff denied

---

[4] "'MLP' degree . . . refers to 'mid-level professional.' This is a term for a variety of health care positions, most often a physician's assistant." *Hairston v. Negron*, 557 F. App'x 884, 886 n.2 (11th Cir. 2014).

nausea, vomiting, headaches and dizziness. (*Id.*). Nurse Worlds noted that plaintiff

was in no acute distress and that he would see the MLP for a follow-up. (Doc. 107,

Ex. A at 11; Doc. 58, Ex. 3 at 11). Neither party describes, nor is there a record of,

the follow-up scheduled for November 9, 2010.

On January 20, 2011, plaintiff was seen by FCI-Marianna healthcare provider

MLP Gardner at a Chronic Care Clinic (CCC) appointment to address his

hypertension. (Doc. 107, Ex. A at 12; Doc. 58, Ex. 4, Lopez Decl. ¶ 8 and Ex. 3 at

12). Plaintiff complained to Gardner of a tingling sensation in his arms and legs

when he tried to run or stretch. (Doc. 107, Mask Aff. ¶ 13 and Ex. A at 12; Doc. 58,

Ex. 3 at 12). Plaintiff reported that these symptoms began after his football injury

in November, and that the symptoms had improved since that time. (*Id.*). Plaintiff

reported his pain level as 8 and the pain quality as "pins and needles, radiating and

sharp." (*Id.*). Plaintiff identified exacerbating factors as running and refereeing

basketball, and relieving factors as naproxen. (*Id.*). MLP Gardner described

plaintiff's injury as "sprain, strain cervical spine" incurred on November 6, 2010,

and described the radiology results as "CT of neck reveals posterior osteophytes at

C3, C4, & C7." (Doc. 107, Mask Aff. ¶ 13 and Ex. A at 13; Doc. 58, Ex. 3 at 13).

MLP Gardner performed a physical examination of plaintiff and noted that his

shoulders were normal with full range of motion, and that his motor system strength

had some weakness on the right side. (Doc. 107, Ex. A at 13; Doc. 58, Ex. 3 at 13).

Gardner reviewed plaintiff's medications and, relevant to the neck sprain and strain

and associated pain, prescribed methylprednisolone and naproxen. (Doc. 107, Ex.

A at 14-15; Doc. 58, Ex. 4, Lopez Decl. ¶ 8 and Ex. 3 at 14-15). Gardner noted:

"Based on CT findings I just received – I will refer for follow up with MD." (Doc.

107, Ex. A at 15; Doc. 58, Ex. 3 at 15).

Four days later, on January 24, 2011, plaintiff saw BOP healthcare provider

Dr. Ernesto Toledo at a CCC visit. (Doc. 107, Mask Aff. ¶ 14 and Ex. A at 16; Doc.

58, Ex. 4, Lopez Decl. ¶ 9 and Ex. 3 at 16). Plaintiff reported a pain level of 0. (*Id*.).

Dr. Toledo found that plaintiff's hypertension was stabilized with his current

treatment, and instructed plaintiff to follow-up at sick call or CCC as needed. (*Id*.).

Plaintiff states that his pain was reduced "due to the pain meds". (Doc. 107, Ex. D,

Shipman Decl. at 2-3).

On July 15, 2011, plaintiff had a CCC appointment with MLP Gardner to

review his hypertension medication. (Doc. 107, Ex. A at 18-19; Doc. 107, Ex. D,

Shipman Decl. at 3; Doc. 58, Ex. 3 at 19). Plaintiff reported aching pain in multiple

locations with a pain level of 4. (Doc. 107, Mask Aff. ¶ 15 and Ex. A at 19; Doc.

58, Ex. 3 at 19). Gardner noted plaintiff's prior radiology results of November 6,

2010, as indicating "CT-osteophytes at C3, C4, with calcification at longitudinal

ligament". (*Id*.). Gardner performed a physical examination of plaintiff, noting that his neck was supple and symmetric with full range of motion and no tenderness or swelling; and that his motor system, including muscular strength, was normal. (Doc. 107, Ex. A at 20; Doc. 58, Ex. 4, Lopez Decl. ¶ 9; Doc. 58, Ex. 3 at 20). Gardner assessed plaintiff's condition as chronic neck sprain and strain showing "marked improvement". (Doc. 107, Ex. A at 20; Doc. 58, Ex. 3 at 20). MLP Gardner renewed plaintiff's medications for naproxen and ranitidine (a gastric acid reducer), requested an x-ray of plaintiff's cervical spine, and instructed plaintiff to follow up at sick call or CCC as needed. (Doc. 107, Mask Aff. ¶ 15 and Ex. A at 21; Doc. 58, Ex. 4, Lopez Decl. ¶ 9 and Ex. 3 at 21; Doc. 107, Ex. D, Shipman Decl. at 3). Gardner's treatment plan was reviewed and co-signed by Dr. Toledo, who agreed with Gardner's treatment and management plan. (Doc. 107, Ex. A at 17; Doc. 58, Ex. 3 at 17).

On July 28, 2011, MLP Gardner met with plaintiff for a follow up, including discussion of x-ray results. (Doc. 58, Ex. 3 at 22). Plaintiff complained of aching and radiating pain in his neck and back, with a pain level of 7. (Doc. 107, Mask Aff. ¶ 16 and Ex. A at 22; Doc. 58, Ex. 3 at 22). Gardner reviewed the new x-ray results, noting they were "negative". (Doc. 107, Ex. A at 22). Gardner also reviewed the CT scan performed on November 6, 2010, noting it showed calcifications and osteophytes. (*Id*.). Gardner documented that plaintiff's neck was supple and

symmetric with full range of motion and that there were no growths, masses or deformities. (Doc. 58, Ex. 4, Lopez Decl. ¶ 9 and Ex. 3 at 22; Doc. 107, Ex. A at 22). Gardner's musculoskeletal exam revealed full range of motion, muscle spasms, but no tenderness or swelling. (Doc. 107, Ex. A at 22; Doc. 58, Ex. 3 at 22). Physical examination of plaintiff's cervical spine was normal with full range of motion. (*Id.* at 23). MLP Gardner assessed plaintiff's neck sprain and strain as "chronic" and "improved", and scheduled plaintiff's next CCC visit for October 12, 2011. (Doc. 107, Mask Aff. ¶ 16 and Ex. A at 23; Doc. 58, Ex. 3 at 23). Gardner instructed plaintiff to follow up with sick-call or CCC as needed. (*Id.*).

On November 14, 2011, plaintiff had a CCC appointment with MLP Gardner for his hypertension and for what Gardner described as "chronic arthritic type pain to neck after football injury." (Doc. 107, Mask Aff. ¶ 17 and Ex. A at 24; Doc. 58, Ex. 4, Lopez Decl. ¶ 10 and Ex. 3 at 24). Gardner noted that plaintiff "continues to c/o shocks to entire body, constant b/l shoulder pain." (Doc. 107, Mask Aff. ¶ 17 and Ex. A at 24; Doc. 58, Lopez Decl. ¶ 10 and Ex. 3 at 24). Plaintiff described aching pain to his neck and back with a pain level of 8. (*Id.*). Gardner noted plaintiff's prior CT scan results of posterior osteophytes at C3-C4, anterior osteophytes at C3-C4, C7. (Doc. 107, Ex. A at 25; Doc. 58, Ex. 3 at 25). After a physical examination, Gardner noted that plaintiff's neck was supple and symmetric

with full range of motion and no growths, masses, lymphadenopathy, or deformities. (*Id*.). Gardner's neurological examination revealed normal results, with normal muscular strength and normal light touch sensation. (*Id*.). Gardner assessed plaintiff's chronic neck sprain and strain as "At Treatment Goal". (Doc. 107, Mask Aff. ¶ 17 and Ex. A at 25; Doc. 58, Ex. 3 at 25). Gardner prescribed prednisone and naproxen for plaintiff's neck, and instructed him to follow-up at sick call or CCC as needed. (Doc. 107, Ex. A at 26; Doc. 58, Ex. 3 at 26). Dr. Mask disagrees with the Gardner assessment because "the record shows no improvement." (Doc. 107, Mask Aff. ¶ 17).

On January 26, 2012, plaintiff had a CCC appointment with MLP Gardner for hypertension. (Doc. 107, Mask Aff. ¶ 18 and Ex. A at 27; Doc. 58, Ex. 4, Lopez Decl. ¶ 11 and Ex. 3 at 27). Gardner noted plaintiff's history of "chronic arthritic type pain to neck after football injury" and that plaintiff "has no complaints at this time." (*Id*.). Plaintiff explains, however, that the question MLP Gardner asked him was, "[O]ther than your neck injury, do you have any other complaints?" and that he responded, "no". (Doc. 107, Ex. D, Shipman Decl. at 3). Gardner listed no pain scale or pain quality. (Doc. 107, Mask Aff. ¶ 18 and Ex. A at 27; Doc. 58, Ex. 4, Lopez Decl. ¶ 11 and Ex. 3 at 27). Gardner assessed plaintiff's chronic neck sprain and strain as "Not Improved/Same", and ordered an x-ray of plaintiff's cervical

spine. (Doc. 107, Mask Aff. ¶ 19 and Ex. A at 29; Doc. 58, Ex. 3 at 29). Dr. Mask

pointed out what he saw as an inconsistency in Gardner's notes:

> Although Ms. Gardner writes that the patient has no complaints
> (presumably about the spinal injury also), she goes on in the same report
> on page 3 to document that patient's neck sprain and strain progress is
> "not improved/same" and orders more tests from Radiology because of
> the chronic neck injury. Id. at 29. This contradicts the claim the patient
> had no complaints, no pain scale or pain quality.

(Doc. 107, Mask Aff. ¶ 19 (*citing* Doc. 107, Ex. A at 29)).

An x-ray of plaintiff's cervical spine was performed on February 8, 2012 with

the following results: "Negative except for mild degenerative disc disease.

Straightening of the normal cervical lordosis may be positional or secondary to

spasm. Shoulder artifact obscures C7-T1". (Doc. 107, Mask Aff. ¶ 20 and Ex. A at

30; Doc. 58, Ex. 4, Lopez Decl. ¶ 11 and Ex. 3 at 30). On April 17, 2012, plaintiff

had a CCC appointment with MLP Gardner for hypertension. (Doc. 107, Ex. A at

31; Doc. 58, Ex. 4, Lopez Decl. ¶ 11 and Ex. 3 at 31). Gardner noted plaintiff's

"chronic arthritic type pain to neck after football injury" and that plaintiff "has no

complaints at this time." (*Id*.). Gardner also noted, however, that plaintiff voiced

subjective complaints of aching at a pain level of 2. (*Id*.). A physical examination

revealed all normal results and full range of motion. (*Id*.). Gardner assessed

plaintiff's chronic neck sprain and strain as "Not Improved/Same". (Doc. 107,

Mask Aff. ¶ 21 and Ex. A at 33; Doc. 58, Ex. 3 at 33). Gardner renewed plaintiff's

prescription for naproxen, demonstrated neck exercises to help plaintiff loosen his neck, and instructed plaintiff to follow-up at sick call or CCC as needed. (Doc. 107, Ex. A at 33 and Ex. D, Shipman Decl. at 3; Doc. 58, Ex. 3 at 33).

On June 6, 2012, plaintiff again saw MLP Gardner. (Doc. 107, Ex. D, Shipman Decl. at 3). Plaintiff voiced concern about the spinal injury and that the medication was reducing his pain without "fixing the problem." (*Id*.). Gardner suggested giving plaintiff a steroid injection in his neck, but plaintiff declined. (*Id*.). Gardner submitted an administrative request that plaintiff be referred for a neurological evaluation. (Doc. 107, Mask Aff. ¶ 22 and Ex. A at 34; Doc. 58, Ex. 4, Lopez Decl. ¶ 12 and Ex. 3 at 34). Gardner stated the reasons for her request:

> Refer[r]al for neurological evaluation for this [redacted] year old male with chronic bilateral shoulder pain with radiation into bilateral arms, radicular pain into "entire body". Football injury 11/6/10 on rec yard with subsequent temporary paralysis lasting 3-4 hours.
>
> X-Ray: Mild DDD, straightening of normal cervical lordosis, shoulder artifact obscures C7-T1
>
> CT of neck/time of accident: Posterior osteophytes C3-C4, anterior osteophytes C3-4, C7

(Doc. 107, Ex. A at 34; Doc. 58, Ex. 3 at 34). Gardner indicated her provisional diagnosis as radiculopathy. (*Id*.). In Dr. Mask's opinion, MLP Gardner's citation to the results of the initial CT-scan taken on November 6, 2010, along with plaintiff's chronic pain and the November 6, 2010, football injury with accompanying

temporary paralysis, "corroborates the contention that the neurological refer[r]al and MRI should have been ordered on the date of the accident." (Doc. 107, Mask Aff. ¶ 22).

On July 13, 2012, plaintiff had a CCC appointment with MLP Gardner. (Doc. 58, Ex. 4, Lopez Decl. ¶ 13; Doc. 58, Ex. 3 at 35). Gardner noted that plaintiff "ha[d] slight improvement in neck pain as well as tingling in arms", and that plaintiff scored his pain at 3. (Doc. 107, Mask Aff. ¶ 23 and Ex. A at 35; Doc. 58, Ex. 4, Lopez Decl. ¶ 12 and Ex. 3 at 35). Plaintiff explains that "[t]he pain level was low due to the meds." (Doc. 107, Ex. D, Shipman Decl. at 4). Gardner noted that plaintiff had a pending neurology consultation. (Doc. 107, Mask Aff. ¶ 23 and Ex. A at 35; Doc. 58, Ex. 4, Lopez Decl. ¶ 12 and Ex. 3 at 35). Gardner's physical examination revealed normal results. (Doc. 58, Ex. 4, Lopez Decl. ¶ 13 and Ex. 3 at 35-36). Gardner assessed the progress of plaintiff's "sprain and strain" of his neck, shoulder and arm as "Treatment Goal Attained". (*Id*. at 36). Dr. Mask questions that assessment:

> On July 13, 2012, Ms. Gardner documents a "slight" improvement in neck pain and arm tingling, although she describes pain scale at 3 and pain quality as "aching." She also notes patient is still pending neurology consultation. See: Exhibit A at 35. However, she assesses that the treatment goal for the neck, sprain and strain is attained. Id. at 36.

(Doc. 107, Mask Aff. ¶ 23).

On October 22, 2012, plaintiff was seen by FCI-Marianna healthcare provider Dr. Lopez at a CCC appointment for hypertension. (Doc. 107, Mask Aff. ¶ 24 and Ex. A at 39; Doc. 58, Ex. 4, Lopez Decl. ¶ 13 and Ex. 3 at 39). Dr. Lopez's physical examination revealed normal results. (*Id.*). With regard to plaintiff's neck, Dr. Lopez noted: "Patient refers doing well that his neck is ok now." (Doc. 107, Ex. A at 39; Doc. 58, Ex. 3 at 39). Dr. Lopez states that plaintiff rated his pain level at 0. (Doc. 58, Ex. 4, Lopez Decl. ¶ 13 and Ex. A at 39). Plaintiff denies ever telling Dr. Lopez that his neck was "ok now". Plaintiff describes his conversation with Dr. Lopez this way:

> He listen to my heart and lungs, then he poked around in my stomach, he also checked me for a hernia. Before leaving his office, I asked him about my neck. His reply was, you will not have any surgery and you have something like whiplash. I then left his office under the impression that this medical advi[c]e was at the highest level. I later found out upon filing a BP 8 against Dr. Lopez, that he falsified federal documents when he stated to the Warden that I said my neck was fine and I didn't need the Neurological Eval.

(Doc. 107, Ex. D, Shipman Decl. at 4). Dr. Lopez did not renew plaintiff's prescription for naproxen "in light of [plaintiff's] statements during this visit." (Doc. 58, Ex. 4, Lopez Decl. ¶ 13). Dr. Lopez discontinued the June 6 neurological consultation request, "as there was no clinical indication it was necessary." (Doc. 58, Ex. 4, Lopez Decl. ¶ 13; *see also* Doc. 58, Ex. 3 at 38 ("No clinical indication for this consult at this time will D/C and can resubmit if there is a problem.")).

Plaintiff did not immediately learn Lopez discontinued the neurology consultation.

After discovering it was discontinued, plaintiff filed an informal grievance (on May

4, 2013). (Doc. 107, Ex. E). Dr. Mask observes:

> Here Dr. Lopez is discontinuing (D/C) the patient's neurological
> refer[r]al and his stated reason is, "Patient refers doing well that his
> neck is OK now." This refer[r]al was cancelled based on patient's
> indications. Physical examination data typically warrants and guides
> refer[r]als for additional investigations of injury and discomfort. The
> primary care physician's directives should have been based on the
> substantial physical data existing at the time of this encounter.
>
> Because of the documented medical evidence establishing a
> serious spinal injury that began in November of 2010 at the patient's
> first medical encounter, Ms. Gardner, Dr. Lopez and Dr. Toledo had
> sufficient information to know that a neurological refer[r]al and MRI
> was needed for this patient, certainly on the date of the accident, and
> especially years later. Any other reasonably trained medical
> professional, under the same or similar circumstances, and knowing
> what Ms. Gardner, Dr. Lopez and Dr. Toledo knew at the time would
> have referred the patient to a neurologist and would have at least taken
> an MRI. A reasonably trained medical professional would have
> understood that the standard of care in this case was to refer this patient
> to a neurologist and have an MRI performed on the date of the accident
> because of the documented evidence establishing a serious spinal
> injury. Ms. Gardner, Dr. Lopez and Dr. Toledo deviated from this
> standard and this deviation was the proximate cause of the significant
> pain and injury to this patient over nearly a four year period.

(Doc. 107, Mask Aff. ¶¶ 24-25). Dr. Mask repeats his conclusion later in his

affidavit:

> Dr. Lopez knew or should have known that the neurology consult
> and the MRI were absolutely essential. Cancelling the neurology
> consult based on representations attributable to the patient, when there

existed substantial medical evidence in the record to the contrary, was negligent.

(Doc. 107, Mask Aff. ¶ 29) (footnote omitted).

On February 12, 2013, plaintiff had a CCC appointment with MLP Gardner for hypertension. (Doc. 107, Mask Aff. ¶ 26 and Ex. A at 43; Doc. 58, Ex. 4, Lopez Decl. ¶ 14 and Ex. C at 43). Gardner noted that plaintiff voiced no complaints and rated his pain scale at 0. (*Id*.). Plaintiff explains that Gardner asked him if he had any complaints other than his injury, and that his response was, "no". (Doc. 107, Ex. D, Shipman Decl. at 4). MLP Gardner assessed plaintiff's neck condition as "Current, Chronic, At Treatment Goal". (Doc. 107, Mask Aff. ¶ 26 and Ex. A at 44). Dr. Mask, though, finds, "[i]t is difficult to establish what treatment goal Ms. Gardner is referencing in the face of all the medical evidence of a serious spinal injury going back over two years." (Doc. 107, Mask Aff. ¶ 26).

On June 3, 2013, plaintiff saw MLP Gardner at a CCC appointment for his hypertension. (Doc. 107, Ex. A at 47; Doc. 58, Ex. 3 at 47). Plaintiff reported aching, burning, pins and needles and radiating pain throughout multiple locations, rating the pain at a level 5. (Doc. 107, Mask Aff. ¶ 28 and Ex. A at 47). Gardner noted plaintiff's history of trauma based on his 2010 football injury. (*Id*.). Gardner assessed the neck sprain and strain as "Not Improved/Same", and requested an order for x-rays of plaintiff's cervical spine and neck. (Doc. 107, Mask Aff. ¶ 28 and Ex.

A at 48; Doc. 58, Ex. 4, Lopez Decl. ¶ 14 and Ex. 3 at 48). Gardner noted the earlier

approval for a neurology consult and its subsequent discontinuance. (Doc. 107,

Mask Aff. ¶ 28 and Ex. A at 49; Doc. 58, Ex. 3 at 49). Gardner ordered that plaintiff

be referred to the clinical director for follow-up on the neurological plan. (*Id*.).

On June 26, 2013, MLP Gardner again requested a neurology consultation for

plaintiff. Gardner's stated reasons for her request are identical to those supporting

her June 6, 2012, request. (Doc. 107, Mask Aff. ¶30 and Ex. A at 51; Doc. 58, Ex.

3 at 51). Dr. Mask emphasizes that plaintiff's complaints of pain were not new, but

were the same complaints he had been voicing for years. (Doc. 107, Mask Aff. ¶ 30

(*citing* Ex. A at 10, 11, 12, 19, 22, 24, 31 and 35)).

On July 30, 2013, MLP Gardner submitted yet another request for a neurology

consultation, noting her previously-stated reasons and adding:

> Add'l Information: Radiating to bilateral arms equally, at times he has
> "shock-like" pain that radiates into bilateral arms and legs at the same
> time.
>
> Pain Scale: Multiple Locations, 5/10
>
> Pain Qualities: Aching | Burning | Pins and Needles | Radiating
>
> Relieving Factors: Naproxen, Methylprednisolone, Prednisone

(Doc. 107, Mask Aff. ¶ 30 and Ex. A at 52; Doc. 58, Ex. 3 at 52). Gardner noted a

provisional diagnosis of "Chronic Cervical Strain, Neuropathy". (*Id*.).

On August 8, 2013, Dr. Lopez submitted a referral for a neurology consultation. (Doc. 107, Ex. E at 5). The consultation was approved by the Regional Reviewer on August 14, 2013. (*Id.*).

While the neurological consultation was pending, plaintiff had a CCC appointment with Dr. Lopez for hypertension on September 25, 2013. (Doc. 107, Ex. A at 54; Doc. 58, Ex. 3 at 54). Dr. Lopez reported that "Patient refers doing well," and that his pain level was 0. (Doc. 107, Mask Aff. ¶ 31 and Ex. A at 54; Doc. 58, Ex. 4, Lopez Decl. ¶ 14 and Ex. 3 at 54). Dr. Lopez did not discontinue the neurological consultation and explains that it was "[d]ue to the recurring issues". (Doc. 58, Ex. 4, Lopez Decl. ¶ 20). Dr. Mask makes these remarks about Dr. Lopez's explanation:

> This [plaintiff's alleged statement that he was doing well and had no pain] is the same reason Dr. Lopez gave to justify cancelling the first neurology evaluation on June 6, 2012. He now claims that he did not discontinue this evaluation "due to recurring issues." This patient has had recurring pain since the date of the accident, November 6, 2010. Even after Ms. Gardner refiled the neurology refer[r]al on June 26, 2013, Dr. Lopez himself filed or approved the refer[r]al again on August 8, 2013, under the weight of an administrative complaint filed against him. This whole process represented an unreasonable delay in the medical care this patient deserved.

(Doc. 107, Mask Aff. ¶ 31) (citations to record omitted). The administrative complaint referenced by Dr. Mask is a series of prison administrative grievances plaintiff filed beginning with an informal administrative grievance on May 4, 2013,

a formal grievance on July 16, 2013, and a regional grievance appeal on August 26, 2013. (Doc. 107, Ex. E). The response to plaintiff's regional appeal, dated October 29, 2013, advised plaintiff that a neurology consultation was pending. (*Id*.).

On December 13, 2013, x-rays of plaintiff's cervical spine and neck were performed. These were read as "negative except for mild degenerative disc disease." (Doc. 58, Ex. 4, Lopez Decl. ¶ 14 and Ex. 3 at 58).

On January 17, 2014, plaintiff met with Dr. Ricardo Ayala, a neurologist with the Tallahassee Neurological Clinic. (Doc. 107, Ex. A at 59-62; Doc. 58, Ex. 3 at 59-62). Dr. Ayala identified plaintiff's problem as cervical spondylosis with myelopathy. (*Id*. at 62). Dr. Ayala stated: "To me he has a lot of findings that could suggest cervical myelopathy and it's certainly possible that he could have sustained a contusion to the cervical spine which would have been completely masked by the x-rays as well as CT scan of the cervical spine." (*Id*.). Dr. Ayala referred plaintiff for an MRI of his cervical spine. (*Id*.).

The MRI was performed on February 19, 2014. (Doc. 107, Ex. A at 63; Doc. 58, Ex. 3 at 63). The radiologist, Dr. David Durden, issued a report that same date finding: "Severe cervical spondylostenosis at C3-C4 with cord flattening and perhaps very early spinal cord edema". (*Id*.). Dr. Durden recommended a neurosurgical consultation. (*Id*.).

On the next day, February 20, 2014, plaintiff saw Dr. T. A. Oliver, a

neurosurgeon with the Tallahassee Neurological Clinic. (Doc. 107, Ex. A at 64;

Doc. 58, Ex. 3 at 64). Dr. Oliver found: "multiple level cervical spondylosis from

C3-C6 but without frank spinal cord compression except at C3-4. At this level there

is disc herniation centrally with edema in the spinal cord. The spinal cord was

effaced with evidence of myelomalacia and no spinal fluid is present at that level."

(*Id*. at 67). Dr. Oliver related this impression and recommendation:

> Problem #1: Cervical spondylosis with myelopathy
>
> Rodney Shipman has been referred for evaluation of h[is] signs of
> myelopathy. His history is concerning for a central cord-like syndrome
> in 2010 with likely a chronic myelopathy since that time. On my exam,
> I can see evidence of hyperreflexia and in reviewing his MRI I am
> concerned about ongoing spinal cord injury. I discussed with him the
> risks[,] benefits and indications of an anterior cervical discectomy and
> fusion at C3-4. I have discussed with him the possibility of needing
> further operations following this however I think that given his exam
> and imaging that this is the most appropriate step in trying to arrest
> ongoing spinal cord injury.

(*Id*.). Dr. Oliver performed the anterior cervical discectomy and fusion at C3-4, on

March 12, 2014. (Doc. 107, Ex. A at 68-69; Doc. 58, Ex. 3 at 68-69). Dr. Mask

noted the surgical procedure "served to relieve patient's level of pain." (Doc. 107,

Mask Aff. ¶ 32). Dr. Mask expresses this opinion concerning plaintiff's care:

> In three months, Drs. Ayala, Durden, and Oliver did for this patient
> what Drs. Cattau, Lopez, Toledo, and MLP Gardner for nearly four
> years negligently delayed in doing, which was to provide this patient

with proper medical care. Patient continues to receive care under significantly less pain, however the negligent delay has resulted in permanent injury.

(Doc. 107, Mask Aff. ¶ 32). Dr. Mask does not detail with any specificity the permanent injury caused by what he describes as negligently delayed intervention, nor does he clearly state that earlier intervention would have, more likely than not, improved the ultimate result. (Doc. 107, Mask Aff.).

In contrast to the view of Dr. Mask, Dr. Lopez describes the BOP's medical care as "a course of care . . . that proceeded from conservative treatments, which included the use of NSAIDs, work restrictions, pain management, and increased attention to symptoms, to more invasive procedures." (Doc. 58, Ex. 4, Lopez Decl. ¶ 6). Dr. Lopez concludes:

Again, I deny plaintiff's allegation that I was deliberately indifferent to his medical needs by failing to approve an MRI immediately following his accident or by improperly cancelling a scheduled MRI. I did not cancel Plaintiff's MRI as he alleges, his neurological consultation which may have led to an MRI was discontinued based on his October 22, 2012, encounter as there was no clinical indication it was necessary.

As previously noted, when the second neurological consultation was pending, he had a CCC appointment on September 25, 2013, and he stated that he was doing well and that his pain level was 0. On December 13, 2013, x-ray results on his cervical spine and neck were negative except for mild degenerative disc disorder. Due to the recurring issues I did not discontinue his neurological evaluation.

(Doc. 58, Ex. 4, Lopez Decl. ¶¶ 19-20) (record citations omitted).

Plaintiff states that as a result of the BOP's medical negligence, he experienced these injuries: "[p]hysical pain, emotional distress, headaches, loss of sleep, loss of concentration and over exposure to pain medication[n]." (Doc. 107, Ex. D, Shipman Decl. at 6).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 160 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ("[T]he plain language of Rule 56(a) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). In applying this standard, the court must view the facts in the light most favorable to the non-moving party (here, the plaintiff) and draw all reasonable inferences in favor of that party. *See Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505,

91 L. Ed. 2d 202 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See id*. An issue is "genuine" if the record taken as a whole could lead a rational fact finder to find for the non-moving party. *Id*. Summary judgment is not appropriate "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." *Jeffery v. Sarasota White Sox, Inc*., 64 F.3d 590, 594 (11th Cir. 1995).

## APPLICATION OF THE SUMMARY JUDGMENT STANDARD TO THE MATERIAL FACTS

<u>Government's Liability for Alleged Negligence of Dr. Cattau</u>

The Government first argues that the undisputed facts in the summary judgment record establish that Dr. Cattau (the healthcare provider at Jackson Hospital) was not an employee of the Government. For that reason, the Government says it cannot be liable under the FTCA for the alleged negligence of Dr. Cattau. This point has been carried by the Government.

The FTCA constitutes a limited waiver of sovereign immunity for the United States and, with certain exceptions, renders the United States liable in tort for money damages "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment", 28 U.S.C. § 1346(b), "to the same extent as a private individual under like

circumstances," 28 U.S.C. § 2674. *See also Ochran v. United States*, 273 F.3d 1315, 1317 (11th Cir. 2001) ("The FTCA was designed to provide redress where United States employees committed ordinary torts recognized by state law.").

The FTCA defines "Employee of the government" as:

> (1) officers or employees of any federal agency, members of the military or naval forces of the United States, members of the National Guard while engaged in training or duty under section 115, 316, 502, 503, 504, or 505 of title 32, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation, and (2) any officer or employee of a Federal public defender organization, except when such officer or employee performs professional services in the course of providing representation under section 3006A of title 18.

28 U.S.C. § 2671.  "Federal agency" is defined as:

> As used in this chapter and sections 1346(b) and 2401(b) of this title, the term "Federal agency" includes the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States.

28 U.S.C. § 2671 (emphasis added).

Plaintiff's third amended complaint alleges that Dr. Cattau "has a contractual relationship with the FBOP."  (Doc. 95, p. 5 ¶ 9).  Plaintiff's response to the Government's summary judgment motion asserts:  "Dr. Cattau's status in this matter is addressed in Plaintiff's motion in opposition to defendant Perry Cattau, M.D.'s

motion for summary judgment." (Doc. 112 at 19, ¶ 2). Plaintiff's opposition to

Cattau's summary judgment motion states, in turn: "FCI Marianna has a contractual

relationship with Jackson Hospital, who employs Dr. Cattau, therefore Dr. Cattau is

an independent contractor to the BOP." (Doc. 111 at 1, ¶ 3). Plaintiff explains:

> Since Plaintiff has not yet been allowed to discover the exact nature of
> the contract between FCI Marianna, Jackson Hospital, and its employee
> Dr. Cattau, Plaintiff cannot speak to specific language in it. However,
> suffice to say that Dr. Cattau was an independent contractor, not a BOP
> employee.

(Doc. 111 at 10); *see also id.* at 7-15 (stating plaintiff's conclusion, after identifying

the "control test"[5], that "Dr. Cattau is an independent contractor, not a BOP

employee" for FTCA purposes (*id*. at 10 and 15, ¶ 1). Nonetheless, plaintiff urges

the court to rule that Dr. Cattau "is a defendant amenable to an FTCA suit under

supplemental jurisdiction" (*id*. at 10), because "BOP personnel followed the lead of

Dr. Cattau in denying Plaintiff appropriate medical treatment." (*Id*. at 7)).

   Plaintiff requests additional discovery concerning Jackson Hospital's contract

with the BOP.[6] Plaintiff asserts the discovery "is needed to establish exactly what

---

[5] *See Means v. United States*, 176 F.3d 1376, 1379 (11th Cir. 1999) ("[A] person is not an 'employee of the government' for FTCA purposes unless the government controls and supervises the day-to-day activities of the individual." (*citing Logue v. United States*, 412 U.S. 521, 526-27, 93 S. Ct. 2215, 37 L. Ed. 2d 121 (1973)).

[6] The Government's first motion to dismiss or in the alternative for summary judgment acknowledged the existence of a contract between Jackson Hospital and the BOP. The Government asserted: "The emergency room physician at Jackson Hospital in Marianna, Florida,

is Dr. Cattau's relationship". (Doc. 115 at 3, ¶ 6; *see also id.* at 3, ¶ 1 (asserting that the existence of a contract between Jackson Hospital and the BOP "is relevant and admissible because it establishes an exchange of money for services which is based on an agreement that establishes a contract.")). Plaintiff's proposed discovery consists of one interrogatory and two document requests.

Plaintiff's proposed Interrogatory 9 of his Second Set of Interrogatories asks: "What contractual relationship existed between FCI Marianna and Jackson Hospital in November of 2010, and was this relationship documented in any agreement?" (Doc. 115 at 31 in ECF). Plaintiff's Request 2 of his Second Request for Production seeks "copies of bills for any treatment Plaintiff received from Jackson Hospital, EMS, and Dr. Cattau regarding November 6, 2010, accident" and "copies of methods of payment to Jackson Hospital, EMS, and Dr. Cattau for service performed for Plaintiff." (Doc. 115 at 33 in ECF). Plaintiff's Document Request 8 of his Second request for Production seeks "[c]opy of any contracts or agreements in place on November 6, 2010, between either FCI Marianna, BOP, or United States and Jackson Hospital." (Doc. 115 at 34 in ECF).

---

[Dr. Cattau] was not an employee of BOP but provided care to Plaintiff pursuant to the hospital's contract with BOP. Moreover, BOP did not supervise the contractor or the emergency room physician in 'day-to-day operations. . . .' In his [first amended] complaint, plaintiff acknowledges the emergency room doctor is an employee of Jackson Hospital." (Doc. 57, p. 21).

Even accepting as true that the BOP had a contract with Jackson Hospital, plaintiff fails to demonstrate that the contract will enable him to raise a genuine factual dispute which, resolved in his favor, will show anything other than what he himself says it will show – that Dr. Cattau was an independent contractor with the BOP. Evidence that Dr. Cattau was an independent contractor does not raise a genuine triable issue on the question of the Government's liability for Dr. Cattau's alleged negligence under the FTCA. *See* 28 U.S.C. § 2671. Based on the undisputed material facts and plaintiff's concession that Dr. Cattau was, at most, an independent contractor, a reasonable jury could not find that Cattau was an employee of the Government. The Government is entitled to judgment as a matter of law on plaintiff's FTCA medical negligence claim arising from the actions of Dr. Cattau.

<u>Government's Liability for Alleged Negligence of Dr. Toledo, Dr. Lopez and MLP Gardner</u>

The parties do not dispute that Dr. Toledo, Dr. Lopez and MLP Gardner were employees of the Government at the time they treated plaintiff. The Government moves for summary judgment on three bases: (1) plaintiff is unable to establish that BOP medical staff breached the prevailing professional standard of care because he fails to provide expert testimony; (2) based on the undisputed medical evidence, plaintiff cannot show that FCI-Marianna medical staff acted unreasonably; and (3) plaintiff fails to specifically assert the permanent injury he is claiming and, to the

extent he identifies his injury as the necessity of an anterior cervical discectomy and fusion, he fails to establish that purported deficiencies in the care he received from Government medical staff were the proximate cause and cause in fact of his myelopathy and need for a cervical fusion. (Doc. 102, pp. 13-23).

An FTCA claim is analyzed under the substantive law of the state where the alleged tort occurred. 28 U.S.C. § 1346(b)(1); *F.D.I.C. v. Meyer*, 510 U.S. 471, 478 (1994); *Stone v. United States*, 373 F.3d 1129, 1130 (11th Cir. 2004). The alleged tort occurred in Florida, so Florida tort law applies.

"To state a claim for negligence under Florida law, a plaintiff must allege that the defendant owed the plaintiff a duty of care, that the defendant breached that duty, and that the breach caused the plaintiff to suffer damages." *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1262 (11th Cir. 2001). In addition, to prove medical negligence in Florida,

> the claimant shall have the burden of proving by the greater weight of the evidence that the alleged actions of the health care provider represented a breach of the prevailing professional standard of care for that health care provider. The prevailing professional standard of care for a given health care provider shall be that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers.

Fla. Stat. § 766.102(1). Generally, expert testimony is required to establish the standard of care prevalent in a particular medical field. *Pate v. Threlkel*, 661 So.2d

278, 281 (Fla. 1995); *Torres v. Sullivan*, 903 So. 2d 1064, 1068 (Fla. 2d DCA 2005).

The existence of a medical injury does not create any inference or presumption of negligence against a health care provider; rather, the plaintiff maintains the burden of proving that an injury was proximately caused by a breach of the prevailing professional standard of care by the health care provider. *See* Fla. Stat. § 766.102(3)(b).

Here, the asserted lack of expert testimony does not warrant summary judgment in the Government's favor, because plaintiff has in fact produced an expert opinion which, if credited, establishes the prevailing professional standard of care, breach of that standard by FCI-Marianna employees,[7] and causation between that breach and plaintiff's suffering, at a minimum, interim damages (serious pain for an extended period beyond what he would have suffered had FCI-Marianna employees sought earlier diagnostic intervention). A reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and this inference supports a genuine triable issue.

Accordingly, it is ORDERED:

1. Plaintiff's motion to strike defendant Dr. Lopez's affidavit (doc. 114) is DENIED.

---

[7] Dr. Toledo, Dr. Lopez and MLP Gardner.

2.   Plaintiff's motion to compel discovery (doc. 115) is DENIED WITH PREJUDICE as to plaintiff's requests for additional discovery on the issue of Jackson Hospital's contract with the BOP, and is DENIED WITHOUT PREJUDICE as to plaintiff's remaining requests, as the discovery was not necessary for plaintiff to justify his opposition to the Government's summary judgment motion.  The court will provide a brief discovery period for trial preparation on the FTCA claim going to trial.  (*See* Doc. 99 at 2 (second scheduling order)).

3.   Plaintiff's motion for reconsideration (doc. 110) is DENIED to the extent plaintiff seeks reconsideration of the order (doc. 109) denying his request to extend the summary judgment submission deadline.

And it is respectfully RECOMMENDED:

That the Government's renewed motion for summary judgment (doc. 102) be GRANTED IN PART AND DENIED IN PART as follows:

> a.  That the motion be GRANTED as to plaintiff's claim against the Government under the FTCA for medical care provided by Dr. Cattau.
>
> b.  That the motion be DENIED in all other respects.

At Pensacola, Florida this 28th day of September, 2017.


*/s/* **Charles J. Kahn, Jr.**
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations may be filed within 14 days after being served a copy thereof. Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of objections shall be served upon the magistrate judge and all other parties. A party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.